IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DEWAINE JACKSON JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00156 |
| | § | |
| BNSF RAILWAY, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

Defendant BNSF Railway Company ("BNSF" or "Defendant") moves the Court for summary judgment on all claims of Plaintiff Dewaine Jackson, Jr. ("Jackson" or "Plaintiff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    FACTUAL STATEMENT ......................................................................... 1

  A.   Jackson's Employment Background with BNSF. ................................. 1

  B.   BNSF's Discipline Process and Procedures ........................................ 2

  C.   Jackson's Discipline History ................................................................ 4

     1.   Jackson Receives Level S Discipline in July 2017. ........................... 4

     2.   Jackson is Discharged for Falsification of his FMLA Leave Paperwork. ........ 5

     3.   Jackson is Reinstated in December 2019. .......................................... 8

  D.   Jackson Returns to Work and Claims He is Subject to Unequal Treatment. ....... 9

     1.   Jackson's Engineer Transfer Request is Not Immediately Approved. ............ 9

     2.   Jackson Receives "Coaching and Counseling" for a PTC Penalty. ............... 10

     3.   Jackson Accepts Alternative Handling for Derailing an Engine. ................... 11

  E.   Jackson's Discriminatory Work Environment Allegations ................................ 11

III.   ARGUMENT AND AUTHORITIES ...................................................... 15

  A.   Jackson's Disparate Treatment Discrimination Claims ...................................... 15

     1.   Termination of Jackson's Employment ........................................... 18

     2.   Delay in Jackson's Engineer Seniority Transfer ............................. 21

     3.   Jackson's Coaching and Counseling ............................................... 22

     4.   July 2017 Level S Record Suspension and 2021 Alternative Handling ........ 23

  B.   Jackson's Discriminatory Work Environment Allegations ................................ 25

CONCLUSION ....................................................................................... 30

CERTIFICATE OF SERVICE .............................................................. 31

## I.     INTRODUCTION[1]

This case arises primarily from BNSF's decision to dismiss Jackson from employment because he submitted altered documentation in support of his FMLA leave application. Jackson asserts various claims under 42 U.S.C. § 1981 for race discrimination based on that action as well as a number of other alleged workplace occurrences. He also appears to assert a discriminatory work environment claim. Summary judgment is appropriate because there is no dispute that Jackson submitted false information and his efforts to show that BNSF treated others outside his protected class differently under nearly identical circumstances fails. Moreover, the key decisionmakers did not know his race. Any hostile work environment claim fails because the conduct he points to (to the extent he has admissible evidence) does not rise to the level of an objectively hostile work environment, and BNSF took prompt action aimed at remedying the issues he identified.

## II.     FACTUAL STATEMENT

### A.     Jackson's Employment Background with BNSF.

Jackson began employment with BNSF in March 2007 in Cicero, Illinois, within BNSF's Chicago Division. Jackson Dep. 42:3-24, 45:17-46:2 & Ex. 4. There he worked as

---

[1] The motion is supported by the following evidence: (a) Dewaine Jackson's deposition excerpts (attached as Exhibit A) ("Jackson Dep."), (b) Declaration of Stefanie Detlefsen (attached as Exhibit B) ("Detlefsen Decl."), (c) Declaration of Janssen Thompson (attached as Exhibit C) ("Thompson Decl."), (d) Declaration of Aaron Peterson (attached as Exhibit D) ("Peterson Decl."), (e) Declaration of Carol LeBlanc (attached as Exhibit E) ("LeBlanc Decl."), (f) Declaration of Mali Voloshin-Kile (attached as Exhibit F ("Voloshin-Kile") (g) Declaration of Rachel Taylor (attached as Exhibit G) ("Taylor Decl.") and (h) Jason Elliott's deposition excerpts (attached as Exhibit H) ("Elliott Dep."). BNSF also cites to Plaintiff's Am. Compl. (ECF 16) ("Am. Compl.").

a conductor (and related jobs) before training to also work as an engineer. *Id* at 43:17-44:19 & Ex. 4. Conductor (and related jobs) and engineer are part of a category called TY&E (train, yard and engine). *Id.* at 44:7-11. In 2017 Jackson exercised his right under the applicable collective bargaining agreement to begin working in BNSF's Red River Division in TY&E jobs other than engineer. *Id* at 46:4-21, 49:4-13, 51:16-52:23, Ex. 4. As discussed below, BNSF dismissed him on September 5, 2017, *id.* at 15:13-15, Ex. 1, but he was later reinstated, *id.* at 18:20-19:5, 90:24-91:17, Ex. 10.

## B.     BNSF's Discipline Process and Procedures

BNSF has a progressive disciplinary policy—the Policy for Employee Performance and Accountability ("PEPA")—that applies to scheduled (union) employees. Detlefsen Decl. ¶ 4 & Ex. 1. PEPA lists three categories of rules violations: Standard, Serious (referred to as "Level S"), and Stand-Alone Dismissible. *Id.* A "Stand-Alone Dismissible" offense is one for which PEPA provides that the employee can be dismissed regardless of disciplinary history. *Id.* "Serious" violations encompass a number of categories listed in PEPA. *Id.* Discipline for Level S violations is often a "record suspension," which is a "suspension" in name only; it is noted on an employee's disciplinary record, but it does not result in time away from work or lost pay. Level S suspensions (whether actual or record) also carry "review periods," which are analogous to probation in that an additional Level S violation during a review period can result in more severe discipline. *Id.*

TY&E employees are covered by collective bargaining agreements that provide substantive and procedural protections concerning discipline, including dismissal. Detlefsen Decl. ¶ 6. Generally, under the agreements BNSF is required to provide

2

employees notice of rule violations within a certain amount of time after learning of the violations (30 days in Jackson's case) and the failure to do so prevents BNSF from disciplining the employee. Detlefsen Decl. ¶ 6. BNSF is also obligated, after timely notice, to provide employees with a fair and impartial "investigation." Detlefsen Decl. ¶ 6. An "investigation" in railroad terms is a hearing presided over by a company official. Detlefsen Decl. ¶ 6. Employees are given notice of the hearing and attend with a union representative; they may call witnesses, admit exhibits, question BNSF's witnesses, and testify themselves. Detlefsen Decl. ¶ 6.

In some instances an employee may submit a "waiver" before the investigation occurs. Detlefsen Decl. ¶ 9; Peterson Decl. ¶ 8. A "waiver" gives up the employee's right to an investigation. Detlefsen Decl. ¶ 9. If a waiver is submitted the employee receives the discipline called for by PEPA. Detlefsen Decl. ¶ 9.

After an investigation where the employee "stands for dismissal," meaning the employee is subject to discharge if the violation is shown, management must submit the investigation materials to the "PEPA team," a group of Labor Relations employees in Fort Worth. Detlefsen Decl. ¶ 8; Thompson Decl. ¶ 5. The purpose of the PEPA team reviews is, first, to ensure that BNSF uniformly and consistently applies its discipline policy, and second, to assess potential labor agreement issues if the decision is reviewed by an arbitration panel. Detlefsen Decl. ¶ 8. The result is a "PEPA Recommendation" in which dismissal is either supported or not supported. Detlefsen Decl. ¶ 8. After the PEPA team review, multiple BNSF managers must also approve a proposed dismissal. Detlefsen Decl. ¶ 8. Ultimately, Janssen Thompson, General Manager of Division Operations in BNSF's

3

Red River Division, is responsible for making the decision whether to dismiss an employee within the Red River Division. Thompson Decl. ¶ 5.

A scheduled employee (through the union) can appeal discipline decisions, including dismissal, both within BNSF and to a group of arbitrators referred to as a Public Law Board (or a similar group referred to as an Adjustment Board). Detlefsen Decl. ¶ 7. In those instances, the Board will issue a decision addressing the appeal. The Board can uphold or overturn discipline and dismissal decisions. Detlefsen Decl. ¶ 7. The BNSF and Board processes both permit reinstatement of a dismissed employee. Detlefsen Decl. ¶ 7.

Employees can also sometimes obtain "Alternative Handling." Detlefsen Decl. ¶ 10. Alternative Handling is a non-punitive response to rule violations that includes training and other non-disciplinary measures. Detlefsen Decl. ¶¶ 10, 22. It is not considered disciplinary in nature and has no adverse impact on the employee's employment. Detlefsen Decl. ¶¶ 10, 22; Thompson Decl. ¶ 22. By choosing Alternative Handling, employees accept responsibility for violating the cited rules and voluntarily waive their right to an investigation. Detlefsen Decl. ¶¶ 10, 22.

## C. Jackson's Discipline History

### 1. Jackson Receives Level S Discipline in July 2017.

In July 2017, Jackson was working as a conductor when the train passed a stop signal in violation of BNSF's rules. Petersen Decl. ¶ 6; Jackson Dep. 156:25-157:11. BNSF notified Jackson (as well as the engineer on the same trip) of an investigation regarding the matter. Petersen Decl. ¶ 7 & Ex. 2; Detlefsen Decl. ¶ 11 & Ex. 2; Jackson Dep. 152:24-153:3 & Ex. 14. As the notice states, supervisor Aaron Petersen determined that neither

4

Jackson nor the engineer were eligible for Alternative Handling because the violation involved what are referred to as Critical Work Practices. Petersen Decl. ¶ 7 & Ex. 2.

After the investigation, Petersen reviewed the investigation materials, determined that Jackson had violated certain rules, and issued him a Level S 30-day record suspension with a 36-month review period. Petersen Decl. ¶¶ 5, 9 & Ex. 1; Detlefsen Decl. ¶ 11 & Ex. 5; Jackson Dep. 165:7-9 & Ex. 15. Although Jackson attempted to lay blame on the engineer, BNSF's rules provide that the engineer and the conductor are equally responsible for such violations. Petersen Decl. ¶ 9; Jackson Dep. 158:12-16. The engineer chose to submit a waiver and also received a Level S 30-day record suspension. Petersen Decl. ¶ 8.

### 2. Jackson is Discharged for Falsification of his FMLA Leave Paperwork.

For a number of years, Jackson was approved for intermittent Family and Medical Leave Act ("FMLA") leave. Jackson Dep. 58:3-59:1. In 2017 he sought to continue that leave. *Id.* As part of those efforts his physician, Dr. Dorothy Jones, submitted an FMLA medical certification to BNSF. *Id.* at 60:15-61:12 & Ex. 6. That form identified treatment dates of June 4 and June 28, 2016:



BNSF Employee Services (which handles FMLA issues) sent Jackson a letter explaining that additional information was needed. Jackson Dep. 57:19-21 & Ex. 5. One issue was that the medical certification identified 2016 treatment dates, and BNSF needed him to provide dates that would support a 2017 leave request:

> *Additionally, please ask the provider to make the following updates, confirming their changes with their initials, date, and faxing directly back to our office by 06/08/2017:*
>
> - *2d, please provide 2 current treatment dates, (mm/dd/yyyy), as FMLA regulations require chronic conditions to be treated at least twice in a 12-month period, therefore, we cannot accept the dates of 06/04/2016 and 06/28/2016 as these were used on your previous application.*

*Id.* 61:20-62:5 & Ex. 5.

Jackson responded by erasing the dates on the medical certification his doctor had completed, writing in dates from 2017 on which he contends he had received medical treatment (though not from Dr. Jones), and faxing the page with the altered dates to BNSF:

2d. List last (2) two dates (mm/dd/yy) you treated the patient for the serious health condition: ___3/16/17___
___6/9/17___

Jackson Dep. 62:7-63:14 & Ex. 7.

Employee Services informed Jackson that since the certification was not faxed from his medical provider as instructed, his medical provider would have to authenticate the updates to the medical certification form. Detlefsen Decl. ¶ 12 & Ex. 8 (Inv. ex. C-11). Jackson replied that his provider was "on vacation for a month and a half" and that he would find a new provider. Detlefsen Decl. ¶ 12 & Ex. 8 (Inv. ex. C-13). Then, on July 26, 2017, Dr. Jones faxed a handwritten note to BNSF stating that she had not made the changes to the certification form Jackson had submitted. Jackson Dep. 90:13-20, 94:1-8 & Ex. 9.

BNSF then noticed Jackson for investigation concerning his apparent falsification of the FMLA leave paperwork. Detlefsen Decl. ¶ 12 & Ex. 6; *see also id.* Exs. 7 & 8 (Inv. Transcript and exhibits). Jackson argued then, and still maintains, that Employee Services had authorized him to make the changes to the form. As support, he points to the following

sentence in an email from Employee Services:

> "**Please you're your Provider initial and date the corrections on the Certification form** and fax back to our office…"

Jackson Dep. 69:23-72:6 & Ex. 8 (emphasis added). He contends that the "Please you're your provider" phrase led him to believe that he was his own medical provider and therefore could make the necessary updates. Jackson Dep. 72:23-74:16, 75:4-11, 76:4-22. He did not, however, initial and date the form as the sentence instructed. Jackson Dep. 74:25-75:3. Nor did he change his view based on the sentence just before that one, which states: "Please have your Provider list 2 current treatment dates on Page 2 of the 5 page application." Jackson Dep. 76:23-77:15 & Ex. 8. And he did not seek clarification. Jackson Dep. 76.23-79:1.

Because Jackson stood for dismissal, the investigation materials were sent to the PEPA team for review. Petersen Decl. ¶ 10; Detlefsen Decl. ¶ 13. PEPA team member Stephanie Detlefsen independently reviewed the testimony and evidence from the investigation as well as Jackson's disciplinary record. Detlefsen Decl. ¶¶ 12-13 & Exs. 7-8. She determined that the evidence showed that Jackson had submitted a falsified document in connection with his attempt to obtain FMLA leave and that his doing so constituted dishonesty in violation of BNSF's rules, specifically BNSF General Code of Operating Rules (GCOR) 1.6. Detlefsen Decl. ¶ 14. She did not accept Jackson's argument based on the "Please you're your provider" phrase and viewed it as not only lacking in credibility but also as showing a lack of honesty or acceptance of responsibility. Detlefsen Decl. ¶ 15. The fact that Jackson had successfully submitted FMLA paperwork to BNSF

for a number of years bolstered her conclusion. Detlefsen Decl. ¶ 16.

Detlefsen therefore issued a PEPA Recommendation supporting dismissal of Jackson. Detlefsen Decl. ¶ 14 & Ex. 10. Her decision was consistent with the PEPA and with how BNSF has handled similar situations in the past. Detlefsen Decl. ¶ 17. Jackson's race played no part in her review of the investigation materials or her conclusions: in fact, Detlefsen did not know his race. Detlefsen Decl. ¶ 17.

Petersen then independently reviewed the investigation materials and determined that the evidence showed a violation in that Jackson admitted altering FMLA paperwork and submitting it to the company. Petersen Decl. ¶ 11. He recommended moving forward with Jackson's dismissal, per the PEPA Recommendation. Petersen Decl. ¶ 11 & Ex. 4.

General Manager Janssen Thompson reviewed the investigation materials and the recommendation of dismissal from the PEPA team and Petersen. Thompson Decl. ¶ 7. He similarly did not find Jackson's reliance on the Employee Services email credible. Thompson Decl. ¶ 8. Ultimately, Thompson concluded that the evidence clearly showed that Jackson was dishonest in submitting an altered document to support his leave request. Thompson Decl. ¶ 7. Based on his understanding of the facts and the recommendation by the PEPA team, Thompson decided to dismiss Jackson. Thompson Decl. ¶ 8 & Ex. 1. At the time, Thompson did not know Jackson's race. Thompson Decl. ¶ 3. BNSF terminated Jackson's employment effective September 5, 2017. Petersen Decl. ¶ 12 & Ex. 5.

### 3.    Jackson is Reinstated in December 2019.

Jackson's union challenged his dismissal, eventually taking the matter to arbitration before a Public Law Board ("PLB"). Taylor Decl. ¶¶ 3, 5; Detlefsen Decl. ¶ 19. The PLB

decided to reinstated Jackson. It informed BNSF of that decision on December 9, 2019, in advance of the formal award. Taylor Decl. ¶ 6 & Ex. 1. BNSF then began the process of reinstating Jackson, and he returned to service on February 8, 2020. Taylor Decl. ¶ 7.

The formal PLB award overturned the dismissal decision in part. Taylor Decl. ¶ 8 & Ex. 2. The PLB agreed the "charges were proven" but chose to override BNSF's dismissal decision and reinstate Jackson, but without back pay. Taylor Decl. ¶ 8. Because the PLB said that the time Jackson was off work should be treated as "a lengthy Level S disciplinary suspension," BNSF changed the dismissal on Jackson's record to a Level S actual suspension and placed him on a 36-month review period. Taylor Decl. ¶ 9; Detlefsen Decl. ¶ 19. That is the normal approach for such a reinstatement because PEPA calls for a review period, which runs only during active service, for any Level S suspension. *Id.*[2]

**D.    Jackson Returns to Work and Claims He is Subject to Unequal Treatment.**

**1.    Jackson's Engineer Transfer Request is Not Immediately Approved.**

Shortly after his return, Jackson began requesting to transfer his engineer seniority so as to allow him to work as an engineer in the Red River Division. Thompson Decl. ¶ 12; Jackson Dep. 209:22-211:13 & Ex. 18. Although Jackson had been able to work as a conductor, he could not work as an engineer without transferring his seniority, which required approval of BNSF managers. Thompson Decl. ¶ 12. Thompson initially declined

---

[2] The same PLB also issued a decision concerning Jackson's July 2017 Level S record suspension. Taylor Decl. ¶ 10. It ruled that although Jackson was guilty he should receive what it referred to as standard discipline. Taylor Decl. ¶ 10 & Ex. 3. Therefore, BNSF changed that discipline to a Formal Reprimand with a 12-month review period. Taylor Decl. ¶ 10. That is the normal approach under PEPA for Standard discipline for an employee with Jackson's prior disciplinary record. Taylor Decl. ¶ 10.

to approve Jackson's transfer requests. He did so because Jackson had just been reinstated and he believed that Jackson should work incident and discipline free for approximately one year before approving the transfer request. Thompson Decl. ¶ 14. Again, Thompson did not at that time know Jackson's race. Thompson Decl. ¶ 3. Consistent with Thompson's planned approach, he approved Jackson's transfer request in February 2021, one year after Jackson returned to service. Thompson Decl. ¶ 15; Jackson Dep. 220:13-23 & Ex. 23.

### 2. Jackson Receives "Coaching and Counseling" for a PTC Penalty.

After his seniority transfer, Jackson sought to work as an engineer. Because he previously had worked in the Galveston area, on ly as a conductor, Carol DeBlanc, Road Foreman of Engines in the Galveston, Texas area at the time, worked with him to get him the needed training to allow him to operate a train as engineer. DeBlanc Decl. ¶ 3; Jackson Dep. 51:17-52:23. Jackson later informed her that he was ready and asked to cut several trips from his training list. DeBlanc Decl. ¶ 4. He said he was familiar with those areas because he had been working them as a conductor. *Id.* ¶ 4. Based on Jackson's assurances, DeBlanc allowed him to work on his own as an engineer. *Id.* ¶ 4.

On Jackson's first trip, however, his operation of the locomotive led to the activation of the Positive Train Control ("PTC") system—a GPS-based safety technology that can stop a train when needed to prevent certain incidents. *Id.* ¶ 5. Specifically, Jackson was operating a train in a permanent speed restriction area and failed to make adjustments early enough, which led the train to exceed the permanent speed restriction in the area, causing the PTC system to take over and stop the train. *Id.* ¶ 8; Jackson Dep. 202:5-203:10.

When Jackson returned, DeBlanc had a conversation with him, explaining that he

10

should have known the area was a permanent speed restriction zone and should have taken more time to plan. *Id.* ¶ 11. Although the rules allowed DeBlanc to put Jackson up for discipline, she explained that because it was his first PTC penalty and he was new in the role in the territory, she was giving him a verbal Coaching and Counseling, meaning she simply had the conversation with him. *Id.* ¶¶ 11-12. The Coaching and Counseling had no negative impact on Jackson's employment. *Id.* ¶ 12; Jackson Dep. 202:22-203:11-14.

### 3.    Jackson Accepts Alternative Handling for Derailing an Engine.

In June 2021, Jackson was operating a locomotive as an engineer when he went over a derail, a device in place to prevent a locomotive from traveling past it. Jackson Dep. 174:11-23; 177:3-178:18 & Ex. 16. BNSF scheduled an investigation. Jackson Dep. 174:7-10 & Ex. 16. Jackson, working with his union representative, then accepted Alternative Handling instead of proceeding to an investigation. Jackson Dep. 179:3-13 & Ex. 17. Jackson's conductor (who is white) did the same. Jackson Dep. 187:21-189:20.

### E.    Jackson's Discriminatory Work Environment Allegations

In June 2021 Jackson contacted Human Resources Manager Mali Voloshin-Kile to raise a series of concerns about his BNSF work environment. Voloshin-Kile Decl. ¶ 3. Jackson initially reported two issues but through the course of their communications he raised a number of additional matters, including:

1. He reported seeing what he believes are the letters "HH," which he believes stand for "Heil Hitler," carved on locomotive workstations, which are located in the cab of the locomotive where the locomotive engineer works.

2. He reported learning of an inappropriate social media post by a BNSF employee in which the employee had used a variation of the "N word."

11

3. He objected to the fact that certain BNSF job titles include the term "master" such as Trainmaster or Yardmaster.

4. He said that employees in the Dayton yard crew areas were self-segregating and that management gave preference to employees who sat on what he referred to as the "white side." He stated that African-American and Caucasian employees do not sit or take breaks together and that briefings are only given in the crew room where white employees tend to sit.

Voloshin-Kile Decl. ¶ 4.

Immediately after hearing Jackson's concerns, Voloshin-Kile emailed him notes she took during their phone call and asked him to review them and let her know if he had anything to add. Voloshin-Kile Decl. ¶ 5 & Ex. 2. She also requested that he send her any photos or screenshots to document his concerns. Voloshin-Kile Decl. ¶ 5.

Voloshin-Kile launched a full investigation into Jackson's claims, including follow-up correspondence with Jackson and communications with four Terminal Managers and other key BNSF personnel. Voloshin-Kile Decl. ¶ 6. She communicated extensively with Jackson to obtain further information and continued to be in touch with him throughout the investigation. Voloshin-Kile Decl. ¶¶ 6, 12 & Exs. 3, 6. Jackson provided her a number of photos and videos during the process. Voloshin-Kile Decl. ¶ 6 & Ex. 3.[3]

During Voloshin-Kile's communications with Jackson, it became apparent to her that several of the incidents he had raised were events he had heard about, not matters he

---

[3] Along the way, Jackson also provided recordings of other BNSF employees who did not appear to know they were being recorded. Voloshin-Kile Decl. ¶ 13. As a result, Voloshin-Kile sent Jackson an email reminding him of, and attaching, BNSF's Corporate Policy on Audio and Video Monitoring and Recording, which prohibits BNSF employees from making recordings of other BNSF employees without their consent. Voloshin-Kile Decl. ¶ 13 & Ex. 7; Jackson Dep. 134:18-135:19, 140:4-14 & Ex. 12.

had observed, and some had apparently happened many years earlier. Voloshin-Kile Decl. ¶ 12. For example, with the social-media incident, another employee had reported it previously and at some point Jackson learned of it and included it among his concerns. Voloshin-Kile Decl. ¶ 10. The post was made while the employee was off duty and that employee had already been counseled about the matter. Voloshin-Kile Decl. ¶ 10 & Ex. 5.

Besides working with Jackson himself, Voloshin-Kile also immediately engaged with local management to investigate and attempt to resolve his concerns. Voloshin-Kile Decl. ¶ 7. Ultimately no "HH" etchings were found during the investigation. Voloshin-Kile Decl. ¶ 8. In addition, the photos that Jackson provided did not appear to be the letters "HH," or at least not clearly so. Voloshin-Kile Decl. ¶ 8. Nevertheless, Voloshin-Kile arranged for managers to brief employees on the applicable rule (GCOR 1.24), which requires that equipment not be damaged or defaced. Voloshin-Kile Decl. ¶ 8. Voloshin-Kile also communicated with managers outside of the local area where Jackson is assigned to verify the protocol for addressing such etchings or similar "graffiti" when it is located. Voloshin-Kile Decl. ¶ 8 & Ex. 4.

Voloshin-Kile similarly worked with several managers on the issues Jackson raised concerning self-segregation and briefings. Voloshin-Kile Decl. ¶ 10. Those interactions did not substantiate that any "segregation" was occurring. Voloshin-Kile Decl. ¶ 10. There are two areas where employees sit, and employees sit where they would like to sit. *Id.* ¶ 10. Some sit closer to the location of their lockers. Voloshin-Kile Decl. ¶ 10. Some sit where the others working their shift sit. Voloshin-Kile Decl. ¶ 10. As to briefings, they are held in one location and it is the responsibility of the employees who are located elsewhere to

13

move to the room where the briefing is being given. Voloshin-Kile Decl. ¶ 10. Although Jackson's concerns on those issues were not substantiated, BNSF has nonetheless undertaken a remodeling so that one area will be used for briefings and the other will be designated a lunchroom (although BNSF does not dictate where employees on breaks choose to sit). Voloshin-Kile Decl. ¶ 10.

After thoroughly investigating Jackson's various concerns, Voloshin-Kile analyzed the information that had been and determined that Jackson's claims were unsubstantiated. Voloshin-Kile Decl. ¶ 14 & Ex. 8. She sent Jackson a letter detailing HR's findings on each of his allegations and explaining various remedial actions BNSF was taking notwithstanding her conclusion. *Id.*; Jackson Dep. 266:10-15 & Ex. 27.

Very recently, on April 13, 2022, Jackson raised additional concerns with Voloshin-Kile. They involved perceived discrimination against other employees and graffiti sightings on locomotives. Voloshin-Kile Decl. ¶ 15 & Ex. 9. Jackson sent Voloshin-Kile new photos that he had not previously provided (and that were only recently produced in the lawsuit). *Id.* They include a small poster on which someone wrote "KKK" and a sticker on a control button that Jackson believes is an "OK" or "White Power" sign. *Id.* Ex. 9.

Jackson told Voloshin-Kile he had not reported the graffiti to any person other than her and he did not know the engine numbers of the locomotives with graffiti. Voloshin-Kile Decl. ¶ 16. Voloshin-Kile told Jackson she was looking into his concerns and would get back to him. Voloshin-Kile Decl. ¶ 16. She also asked that if he encountered any additional graffiti or similar items to please note the date and the location (engine number) and notify her and his manager by email as soon as possible. Voloshin-Kile Decl. ¶ 16.

14

That request is important because TY&E employees like Jackson work on numerous locomotives and trains as they pass through the Red River Division, and the locomotives often will vary from day to day. Voloshin-Kile Decl. ¶ 9; Thompson Decl. ¶ 21. Moreover, supervisors are not usually present in the locomotive cabs, and thus there are limited opportunities for them to see any inappropriate markings. *Id.* As a result, BNSF must depend on scheduled employees to report any inappropriate markings in a cab. *Id.* Without a contemporaneous report it is difficult if not impossible to identify the locomotive with suspect markings. *Id.* Nevertheless, Voloshin-Kile is coordinating with a Terminal Superintendent to (a) arrange for his team to continue to audit the locomotives; and (b) to re-brief the employees on the applicable rule concerning graffiti and similar defacing of the items in the locomotive cabs. Voloshin-Kile Decl. ¶ 17.

## III.   ARGUMENT AND AUTHORITIES[4]

Jackson asserts discrimination claims arising from his discharge, the delay in granting transfer of his engineer seniority, and his receipt of a coaching and counseling. Am. Compl. at 4-6. He also appears to assert a hostile work environment claim. *Id.* at 5-6. None of his claims can survive BNSF's summary-judgment motion.

### A.   Jackson's Disparate Treatment Discrimination Claims

The bulk of Jackson's complaint addresses claims of disparate treatment. "In a disparate treatment case, an employee must establish that [the] employer had a

---

[4] As the Court is aware, summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

discriminatory intent or motive for taking a job-related action." *Saketkoo v. Administrators of Tulane Ed. Fund*, __ F.4th __, 2022 WL 1183824, *2 (5th Cir. April 21, 2022). In cases such as this one where there is no direct evidence of discrimination, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Id.* The plaintiff must first establish a prima facie case. *Id.* If the plaintiff does so, the defendant must articulate—but need not prove—a legitimate, non-discriminatory reason for the action, at which point the plaintiff must show that the explanation is a pretext for discrimination. *Id.*; *Sanders v. Christwood*, 970 F.3d 558, 561-62 (5th Cir. 2020). Although the defendant's burden is minimal, the plaintiff's is not: "In response to a motion for summary judgment, an employee must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016). Moreover, "the burden of proof remains with the employee throughout." *Saketkoo*, 2022 WL 1183824 at *4.[5]

To establish a prima facie case, Jackson must show that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably. *Id.* at *3. As to Jackson's disparate treatment claims, BNSF raises the third and fourth elements of the prima facie case as to some of the claims and the

---

[5] Section 1981 claims are evaluated under the same standards as Title VII and other discrimination claims, except that § 1981 claims are subject to a higher causation standard. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014-15 (2020); *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001).

absence of evidence of pretext as to all of the claims.

Concerning the adverse employment action element of the prima facie case, in the Fifth Circuit, for discrimination claims (as distinguished from retaliation claims), the adverse action requirement is high: "Our court has a strict interpretation of the adverse employment element…an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (internal quotation omitted). "Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019).[6]

To satisfy the "similarly situated" showing of his prima facie case, Jackson "must establish that [he] was treated less favorably than a similarly situated employee outside of [his] protected class in nearly identical circumstances." *Saketkoo*, 2022 WL 1183824 at *3 (citing *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009)). To meet that standard, Jackson must proffer a comparator and show that he and the proffered comparator: (1) shared the same job or responsibilities; (2) reported to the same supervisor, or, more precisely, had the same decisionmaker or group of decisionmakers as to the challenged decision; (3) had essentially comparable violation histories and (4) most importantly, that

---

[6] *See also Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007) (holding that the "ultimate employment decision" standard continues to apply to discrimination claims after *White*).

the conduct that drew the adverse employment action was nearly identical. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012); *see Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 322-23 (5th Cir. 2021). The comparator assessment is analyzed through the employer's perspective. *Lee*, 574 F.3d at 261 n.27.

Moreover, a plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. *Delaval*, 824 F.3d at 476; *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). Thus, the "similarly situated" issue may be addressed at both the prima facie stage or the pretext stage, or both, but the required showing at the pretext stage is greater. *See id.*; *see also Lee*, 574 F.3d at 262 (explaining that minor distinctions that may not matter for purposes of a prima facie case are relevant at the pretext stage).

### 1.    Termination of Jackson's Employment

Jackson cannot establish a prima facie case as to his dismissal because he cannot satisfy the "similarly situated" element. He has focused on an employee named Jason (JG) Elliott and points to two alleged instances where he says Elliott falsified documents. Neither supports the required comparator showing.[7]

First, according to Jackson, Elliott falsified paperwork concerning travel mileage in April 2017 but was not dismissed. Jackson Dep. 102:6-103:25. Elliott's alleged conduct

---

[7] In his complaint, Jackson also points to a "J Williams III." Am. Compl. ¶¶ 9. Although BNSF is unsure who he is speaking of, his own description of that person shows that he is not similarly situated. The issue with him was not about falsification of documents but was that his FMLA paperwork did not align with his actual absences, putting him in violation of the attendance policy; it was not a dishonesty issue. *Id.*; Jackson Dep. 96:5-12.

was not nearly identical. His issue was that he submitted mileage reimbursement paperwork using an older method that BNSF had previously accepted but that since had been changed. Petersen Decl. ¶ 14; Elliott Dep. 20:3-25:7, 27:6-21. Because the issue involved a change in BNSF policy, management decided to offer him a waiver of his right to an investigation hearing in exchange for accepting a formal reprimand with a one year review period. Petersen Decl. ¶ 14. He accepted that offer and received that discipline. Petersen Decl. ¶ 14; Elliott Dep. 20:19-22. In contrast to Jackson, Elliott did not alter a document from a third party to make it appear that the third party had stated something that it had not. Petersen Decl. ¶ 16. And unlike the situation with Elliott, BNSF did not have a history of accepting employee-altered medical documentation for FMLA leave. *Id.* Finally, the ultimate decisionmaker with respect to Jackson's discharge, Janssen Thompson, was not involved in the mileage issue. Thompson Decl. ¶ 18. For those reasons, Elliott is not similarly situated as to the first issue. *See Saketkoo*, 2022 WL 1183824 at *3-*4; *Ross*, 993 F.3d at 322-23; *Hernandez*, 670 F.3d at 659; *Lee*, 574 F.3d at 259-60.

Second, Jackson also claims that Elliott falsified paperwork in 2019 but was not disciplined. Jackson Dep. 107:21-109:25. Elliott was accused of falsifying documents that he submitted from his cell phone provider when he was asked to show proof of why he missed a call requesting him to report for duty. Thompson Decl. ¶ 19; Elliott Dep. 7:10-18:12. But even setting aside that it was two years after Jackson's discharge, Elliott's situation was dramatically different: although BNSF did charge him with dishonesty and conduct an investigation, he produced evidence that vindicated himself, or at least prevented BNSF from being able to establish dishonesty. Thompson Decl. ¶ 19; Detlefsen

19

Decl. ¶ 20 & Ex. 12. Similar to Jackson, the investigation materials were then submitted to the PEPA team, but the PEPA team (acting through a different team member than the one involved with Jackson) determined that the charge was <u>not</u> proven in light of evidence that Elliott submitted. *Id.* Therefore, the PEPA team did <u>not</u> support dismissal of Elliott. *Id.* Thompson, who was responsible for all dismissal decisions, is not certain he was involved with the Elliott situation but confirmed that if he had been his practice is to follow the PEPA Recommendation. Jackson cannot compare himself to someone who the company determined had not engaged in misconduct, and where the PEPA team members for the two situations were different. *See Ross*, 993 F.3d at 322-23; *Lee*, 574 F.3d at 259-60.

Even if Jackson could establish a prima facie case, he cannot establish pretext. First, Thompson and Detlefsen did not know his race. Thompson Decl. ¶ 3; Detlefsen Decl. ¶ 17; *see also* Jackson Dep. 51:10-12, 286:13-24. Second, Jackson admitted falsifying the FMLA paperwork. Third, although he offered an excuse—the "Please you're your provider" argument—Thompson and Detlefsen found the excuse to be disingenuous and further evidence of dishonesty. Detlefsen Decl. ¶ 15; Thompson Decl. ¶ 8. In any event, even if he were correct in arguing that BNSF got it wrong, an incorrect decision does not demonstrate pretext. *E.g.*, *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) ("[The employee] must do more than just dispute the underlying facts and argue that [the employer] made the wrong decision in order to survive summary judgment."). Fourth, for the same reasons just discussed he cannot identify any similarly situated employee who received more favorable treatment. Finally, to the extent that Jackson may rely on the fact that an arbitrator reinstated him, that fact does not show pretext. Arbitrators

rely on different standards and, unlike courts or juries, do have some leeway to "second guess" employers' decisions. *See Foster v. BNSF Ry. Co.*, 866 F.3d 962, 965, 969 (8th Cir. 2017) (rejecting effort to rely on a PLB decision overturning discipline as evidence of retaliation).[8] That is particularly true given the PLB's determination that Jackson <u>did</u> violate BNSF's dishonesty rule and its corresponding decision to deny him backpay. Accordingly, Jackson cannot establish a triable fact issue on his discharge claim.[9]

### 2. Delay in Jackson's Engineer Seniority Transfer

Jackson also complains that BNSF did not immediately grant his request to transfer his engineer seniority. Again, he cannot establish a prima facie case of discrimination. First, transferring his seniority, which would allow him to work not only as an engineer but also as a conductor, is not an adverse employment action. *See* Jackson Dep. 44:20-45:16, 231:5-234:8; *see also Thompson v. City of Waco*, 764 F.3d 500, 503-06 (5th Cir. 2014) (requiring a forced transfer to be effectively a demotion before being actionable). Second, he cannot identify any similarly situated employee treated more favorably. The two employees he

---

[8] *See also Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 241 (5th Cir. 2015) (discrimination laws do not permit courts to second-guess wisdom of employment decisions); *Bryant v. Compass Grp., USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones."); *accord LeMaire*, 480 F.3d at 391.

[9] Jackson also asserts that BNSF violated the CBA by failing to initiate the investigation within the applicable 30-day time limit. Am. Compl. ¶ 5; Jackson Dep. 97:16-98:5. He misunderstands the CBA. The time period began to run at (or after) BNSF obtained evidence from Jackson's doctor that she had not altered the document. *See* Detlefsen Decl. ¶ 18. Moreover, to the extent Jackson views the CBA differently, it is settled that disputes about the meaning of a CBA cannot be used to create a triable fact issue because such disputes must be resolved exclusively through the Railway Labor Act's dispute mechanism process. *E.g.*, *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349-51 (5th Cir. 2008).

pointed to differ in that one did not have active discipline at the time and the other—just like Jackson—did have active discipline but was approved only after serving a substantial part of the applicable review period without additional incidents. Thompson Decl. ¶¶ 16-17.

Nor can he demonstrate pretext. Again, Thompson did not know Jackson's race when he declined to approve the transfer. Thompson Decl. ¶ 3. Moreover, Thompson explained that he did not approve the request because Jackson had been recently returned to work through a "leniency" reinstatement (a reinstatement even though the PLB found him guilty of the violation) and Thompson wanted to see him work for approximately one year without further discipline or other incidents before approving him; and when Jackson did so, Thompson promptly approved him. Thompson Decl. ¶¶ 14-15. Jackson has no evidence that Thompson's explanation is pretextual. Although Jackson suggested during his deposition that he was unaware that he was placed on a review period when he was reinstated, Jackson Dep. 214:21-215:4, BNSF has explained in detail that doing so was consistent with the PLB's reinstatement order, BNSF's PEPA policy, and the normal approach for a similar reinstatement. Detlefsen Decl. ¶ 19; Taylor Decl. ¶ 11.

### 3.    Jackson's Coaching and Counseling

Jackson also asserts that BNSF discriminated against him when a manager gave him a coaching and counseling after he operated a train at such excessive speed that the PTC system had to override manual operation and stop the train. Am. Compl. ¶ 12; Jackson Dep. 205:22-206:12. The Court need not dwell long on that allegation. First, a coaching and counseling plainly is not an actionable adverse employment action, particularly here where

it was a simple conversation a manager had and the manager could have invoked the disciplinary process instead. "An employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Pegram*, 361 F.3d at 282. An employer providing direction to an employee does not meet that standard. *See id.*[10] Second, Jackson can identify no comparator who was treated more favorably, at least by the same supervisor. *See* Am. Compl. ¶ 12; LeBlanc Decl. ¶ 14 (explaining that she consistently has similar conversations in the case of similar violations). Third, Jackson has no evidence of pretext: he engaged in speeding and was almost at the point of a mandatory FRA certificate revocation. LeBlanc Decl. ¶¶ 10, 15. That LeBlanc had a conversation with him about it was not discriminatory.[11]

### 4.  July 2017 Level S Record Suspension and 2021 Alternative Handling

During discovery Jackson has also alluded to complaints about the July 2017 Level S record suspension he received as being part of the crew that went through a stop signal as well as his election to take Alternative Handling in 2021 after he ran over a derail. Jackson Dep. 166:15-167:14, 191:23-192.9. Neither alleged adverse action appears in the

---

[10] *See also Daniel v. Board of Supervisors for La. State Univ. Agricultural and Mechanical College*, 2022 WL 1055578, at * 6 (5th Cir, April 8, 2022) ("a low performance evaluation alone is not an adverse employment action."); *Odeh v. City of Baton Rouge/Par. of E. Baton Rouge*, 731 F. App'x 288, 292 (5th Cir. 2018) (written reprimand and warning that future incidents would result in more severe action did not constitute an ultimate employment decision); *Mattern*, 104 F.3d at 708 ("disciplinary filings, supervisor's reprimands, and…poor performance by the employee" do not constitute adverse employment actions).

[11] In his deposition Jackson complained that he also received an "Ops Test" failure. Jackson Dep. 203:15-204:11. But that also is not discipline and had no effect on his job duties, compensation, or benefits. LeBlanc Decl. ¶ 13. And he in fact was responsible for the speeding violation. *Id.* ¶¶ 8, 10.

complaint, and he should therefore not be able to pursue either as a separate claim of discrimination. In any event, neither claim would have merit.

First, there is no adverse action. A record suspension is a suspension in name only. The employee does not actually serve time away from work or lose pay. Detlefsen Decl. ¶ 4. The record suspension is accompanied by a review period, which is essentially probation. Detlefsen Decl. ¶ 4. Neither aspect of the Level S discipline therefore is one that "affect[ed] job duties, compensation, or benefits" and thus an adverse employment action. *Pegram*, 361 F.3d at 282. Similarly, that Jackson opted for Alternative Handling, which is expressly not even a disciplinary action and has no effect on the terms or conditions of employment, Detlefsen Decl. ¶ 4, does not evidence an adverse action. *Id.* Numerous decisions reject attempts to rely on similar conduct.[12]

Second, Jackson cannot establish either the remainder of his prima facie case or

---

[12] *E.g.*, *Daniel*, 2022 WL 1055578 at * 6 ("a low performance evaluation alone is not an adverse employment action"); *Odeh*, 731 F. App'x at 292 (written reprimand and warning that future incidents would result in more severe action did not constitute an ultimate employment decision); *Turner v. Novartis Pharm. Corp.*, 442 F. App'x 139, 141 (5th Cir. 2011) (placement on a performance improvement plan is not an ultimate employment decision); *King v. La.*, 294 F. App'x 77, 84 (5th Cir. 2008) (probation not an adverse employment action); *Stewart v. Missouri Pac. R.R. Co.*, 121 Fed. Appx. 558, 562–63 (5th Cir. 2005) (same); *Brod v. Sprint Corp. & Sprint/United Mgmt. Co.*, 2022 WL 479521, *5 (S.D. Tex. 2022) (two actions plans and final written warning not actionably adverse); *Vandenberg v. University of Saint Thomas* 2020 WL 6822907, * 9 (S.D. Tex. 2022) (placement on a PIP and being relieved of duties not adverse employment action); *Gibbs v. City of Houston*, 2020 WL 7696093, at * 5 (S.D. Tex. 2020) (disciplinary reprimand requiring additional training with suspension recommendation not actionably adverse; no reduction in pay or formal demotion); *Henson v. Texas Southmost College Dist.*, 2020 WL 488991, * 5 (S.D. Tex. 2020) (supervisor reprimands, lack of feedback regarding individual PIP, and criticism not ultimate employment decision).

pretext. He cannot point to any employee who engaged in nearly identical conduct but was treated more favorably. Nor can he show that BNSF's reasons—for both incidents he had violated the rules, and for the 2021 incident he accepted Alternative Handling—are pretexts for discrimination. Notably, he complains in the 2021 situation of being allegedly "forced" to accept Alternative Handling but complains that he was <u>not</u> offered Alternative Handling in 2017. Jackson Dep. 154:21-156:24, 178:19-179:1, 183:16-186:1, 191:23-192:22. He has no evidence of being "forced" to accept Alternative Handling in 2021, *id.* at 193:24-194:16, and his supervisor explained that neither Jackson nor the engineer in the 2017 incident qualified for Alternative Handling so it was not offered, Petersen Decl. ¶ 7.

Jackson also complains that his engineer was to blame for the July 2017 incident, which occurred while Jackson was working as a conductor, while the conductor was to blame for the 2021 incident, which occurred when Jackson was working as an engineer. Jackson Dep. 154:21-155:25, 174:11-178:18, 189:16-20. Despite Jackson's apparent view that he is never at fault, Petersen explained that the rules typically impose equal responsibility on both the engineer and the conductor in similar situations. Petersen Decl. ¶ 9. And in both cases, the engineer and the conductor received the same discipline. Jackson Dep. 187:21-189:20. Petersen Decl. ¶ 8.

## B.  Jackson's Discriminatory Work Environment Allegations

As noted, Jackson *appears* to assert a hostile work environment claim. He does not formally state that theory in his complaint but discusses various events he says were race-based. If he means to assert a harassment claim, versus simply offering those alleged events as evidence on his disparate treatment claims, the harassment claim fails as a matter of law.

25

For a hostile-work environment claim, Jackson must prove: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; (5) BNSF knew or should have known of the harassment and failed to take prompt remedial action. *Hernandez v. Yellow Transp.*, 670 F.3d 644, 651 (5th Cir. 2012). For harassment to affect a term, condition, or privilege of employment it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Id.* And "[t]o be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (internal quotation omitted). Jackson's claims fail for two overarching reasons.

First, he cannot show severe or pervasive harassment based on race. At the outset, certain of the alleged events cannot be considered, beginning with the alleged "HH" markings. It is far from clear that the markings are even "HH." *See* Jackson Dep. Ex. 25. The markings are two lines that are not side by side and sometimes have an intersecting line. *Id.* Nor is there any admissible evidence that they actually mean "Heil Hitler" even if they are two H's. Jackson claims that the text covering the "HH" in some photos indicates it is meant to hide the derogatory meaning of "HH." *Id.* at 237:24-249:20. He also speculates that because unknown individuals have on some occasions altered the markings with positive messages such as "Have Hope" or "Stop Hate," the markings must mean "Heil Hitler." Jackson Dep. 247:20-248:6. He admits he has no idea what the individuals

who wrote positive messages were thinking and that his view depends on his assumption that accurately saw the markings as messages of hate. Jackson Dep. 248:13-249:12.

In light of the above, Jackson cannot show that the markings are based on race. He would be asking a jury to speculate that they do. Relatedly, even if he believes that the markings are race based, the same ambiguity prevents a finding that the markings are *objectively* offensive as required to establish a claim. For those reasons, the Court should not include the "HH" issue in its analysis.

The same is true of the alleged "segregation" and the inclusion of the term "master" in certain job titles. As to the former, Jackson admits that BNSF does not impose any segregation, and the issue is simply that white employees in his view tend to eat in one room and black employees tend to eat in another. Jackson Dep. 121:17-123:9, 255:18-256:19. He has no suggestion on how to remedy that issue. *Id.* 256:24-25 ("That's over my paygrade. I do not know what they should have done."). As to the term "master," *see id.* at 269:12-271:12, he has no evidence that the job titles were derived from a historically racial meaning of that term, and he acknowledges that those job titles apply to all races and he is not required to use the term "master," *id.* at 272:7-273:9. Because Jackson has no evidence that either circumstance is based on his race they cannot support his claim.

Moreover, even considering all of the alleged events Jackson relies on he cannot show that they give rise to an objectively hostile and abusive work environment actionable under the discrimination laws. That includes the two recent occurrences of him observing symbols other than "HH." Specifically, he very recently provided a photo appearing to show a poster on which someone had written "KKK" and a sticker showing what he

27

believes is an "OK" hand signal. *See* Voloshin-Kile Decl. Ex. 9. Taking all of the events together, numerous cases support summary judgment. *See Brooks v. Firestone Polymers, LLC*, 640 F. App'x 393, 399-400 (5th Cir. 2016) (affirming summary judgment on plaintiff's hostile work environment claim and holding that company video monitors depicting allegedly offensive images, racial slurs and "black faces" drawn in the bathroom stalls, and a miniature hangman's noose placed inside an employee's hard hat did not rise to the level of "severe or pervasive harassment" for which the law provides relief).[13]

The holding in *Collier v. Dallas Cty. Hosp. Dist.*, 827 F. App'x 373 (5th Cir. 2020), is instructive. The Fifth Circuit affirmed summary judgment on the plaintiff's hostile work environment claim that rested on three facts: (1) a nurse called him "boy"; (2) the N-word was scratched into an elevator and was not removed for months despite his complaints; and

---

[13] *See also Frazier v. Sabine River Auth. State of La.*, 509 F. App'x 370, 374 (5th Cir. 2013) (holding that a co-worker's use of the N-word as well as a co-worker's noose gesture were not severe or pervasive enough to establish a *prima facie* case for hostile work environment); *Hernandez*, 670 F.3d at 652-57 (finding no hostile work environment where, over ten-year period, employee was called a racially derogatory term on one occasion and saw a poster or letter derogatory towards Hispanics on another); *Rudolph v. Huntington Ingalls, Inc.*, No. 1:06-CV-820-HSO-JMR, 2011 WL 4350941 (N.D. Miss. Sept. 15, 2011) (holding that various racial statements in graffiti on bathroom stalls that read, though highly inappropriate, were not physically threatening or humiliating, and, therefore, insufficient to support a hostile work environment claim); *Fairley v. Huntington Ingalls, Inc.,* No. 1:06-CV-785-HSO-JMR, 2011 WL 4350882, at *15 (S.D. Miss. Sept. 15, 2011) (holding that racially offensive graffiti inside a bathroom stall that was not specifically directed at plaintiff was insufficiently severe or pervasive to support a hostile work environment claim); *Johnson v. Northrop Grumman Shipbuilding, Inc.,* No. 1:06-CV-797-JHSO-JMR, 2011 WL 1045444, at *6 (S.D. Miss. Mar. 17, 2011) (holding that racially derogatory writings, depictions, and graffiti, seen on numerous occasions by plaintiff in bathroom stalls, was insufficient to support a hostile work environment claim); *Jones v. Continental Cuisine, Inc.,* 353 F. Supp. 2d 716, 720 (E.D. La. 2004) (finding no hostile work environment from one use of the term "N——").

(3) two swastikas were drawn on the walls of a room that he worked in and were not painted over for 18 months despite his complaints. *Id.* at 377. The court held that the two instances of racial graffiti and being called "boy" were insufficient to establish a hostile work environment because "the conduct that [he] complained of was not physically threatening, was not directed at him (except for the nurse's comment), and did not unreasonably interfere with his work performance." *Id.* at 378; *see also Satterwhite v. City of Houston*, 602 F. App'x 585, 588 (5th Cir. 2015) (supervisor's use of the phrase "Heil Hitler" not actionable because it was an "isolated incident[] of non-extreme conduct").

Second, BNSF did not fail to take prompt remedial action once learning about the graffiti and the other issues. For each of the workplace concerns Jackson raised, Human Resources conducted a prompt, complete, and impartial investigation and took steps to address the issues, including audits by managers and briefings to employees. Voloshin-Kile Decl. ¶ 14-17. Jackson admits as much. Jackson Dep. 257:19-23. BNSF also encouraged Jackson to provide an immediate report when he sees the markings, because without such a report BNSF cannot feasibly locate the locomotive with the markings. Voloshin-Kile Decl. ¶ 16. And despite the absence of evidence of "segregation," BNSF remodeled the break rooms in an effort to encourage employee interactions and in response to Jackson raising concerns. Voloshin-Kile Decl. ¶ 10.

In *Tolliver v. YRC Inc.*, 729 F. App'x 332, 333 (5th Cir. 2018), the Fifth Circuit upheld summary judgment on similar facts. It concluded that (1) the conduct was not severe or pervasive, particularly where the plaintiffs did not contend that the acts were directed at them, and (2) the defendant took the sort of prompt remedial action that the law requires,

including offering incentives for information on the perpetrators, interviewing employees, reporting the incidents to law enforcement, hiring more security guards, and giving weekly reminders about the company's discrimination policies. The court held that although the company did not discipline anyone, that was because the perpetrators remain unknown. *Id.* Summary judgment is similarly warranted here.

## CONCLUSION

For the reasons stated, BNSF asks the Court to dismiss Jackson's claims with prejudice, order that Jackson take nothing from BNSF, and award BNSF its costs.

Dated: May 4, 2022.

Respectfully submitted,

/s/ Bryan P. Neal
Bryan P. Neal, attorney-in-charge
State Bar No. 00788106
Southern District No. 19107

HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
E-mail: bryan.neal@hklaw.com

OF COUNSEL:

Andrea James
State Bar No. 24092571
Southern District No. 3124869

HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 821-7000
Facsimile: (713) 821-7001

E-mail: andrea.james@hklaw.com
ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY

## CERTIFICATE OF SERVICE

I certify that on May 4, 2022, a copy of this document was electronically filed. Notice of this filing will be sent to all counsel of record by operation of the Court's Electronic Filing System.

s/ Bryan P. Neal
Bryan P. Neal