**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **DEWAINE JACKSON JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-00156** |
| | § | |
| | § | |
| **BNSF RAILWAY,** | § | |
| **Defendant.** | § | **JURY DEMANDED** |
| | § | |

**PLAINTIFF DEWAINE JACKSON JR'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____/S/ _Ashok Bail_____
ASHOK BAIL
ATTORNEY-IN-CHARGE
STATE BAR # 24043541

3120 Southwest Freeway, Suite 450
Houston, TX 77098
(832) 216-6693
(832) 263-0616 (Fax)
ashok@baillawfirm.com

i

**TABLE OF CONTENTS**

I.      NATURE AND STAGE OF THE PROCEEDING……………………………………………..1

II.     STATEMENT OF THE ISSUE AND STANDARDS OF REVIEW…………………………...1

III.    INTRODUCTION AND SUMMARY OF ARGUMENT………………………………….....2

IV.     FACTUAL BACKGROUND………………………………………………………………...2

        A.  Jackson Employment Background with BNSF………………………………………..2

        B.  Jackson Receives Level S Discipline in July 2017 ………………………………………3

        C.  Jackson is Discharged for Falsification of his FMLA Leave Paperwork…………………4

        D.  Jackson is Reinstated After the Arbitrator (PLB) Ruled Against BNSF After Jackson Filed
            His Appeals…………………………………………………………………………………..6

        E.  Jackson's Engineer Transfer Request Not Immediately Approved …………………….....9

        F.  Jackson Receives "Coach and Counseling" for a PTC Penalty……………………………10

        G.  Jackson Accepts Alternative Handling for Derailing an Engine…………………………...11

        H.  Jackson Discriminatory Work Environment Allegations ……………………………13

V.      SUMMARY JUDGMENT STANDARD……………………………………………………14

VI.     ARGUMENT AND CITATIONS OF AUTHORITIES ……………………………………14

        A.  Jackson has Satisfied the Prima Facie Elements of Race Discrimination Under Section
            1981…...…………………………………………………………………………………14

        B.  BNSF's Alleged Reasons for Terminating Jackson are Pretext for Race Discrimination…16

            1. Unequal Discipline of Jason Elliott (White/Caucasian Engineer/Conductor)…………..16
            2. Unequal Discipline of Michael Godfrey (White/Caucasian Engineer/Conductor)……...21
            3. Unequal Discipline of V. B. Harris Jr. (White/Caucasian Engineer/Conductor) ……….26
            4. Unequal Discipline of Jasper Stanley (White/Caucasian Engineer/Conductor)………...28
            5. Unequal Discipline of Nancy Shapley (White/Caucasian Engineer/Conductor)………..30

VII.    CONCLUSION…………………………………………………………………………………30

## I.      NATURE AND STAGE OF THE PROCEEDING

This is an employment discrimination case brought against BNSF Railway ("BNSF") under 42 U.S.C. Sec. 1981 by Plaintiff Dewaine Jackson Jr. BNSF moved for summary judgment against all claims and causes of action asserted by Plaintiff Dewaine Jackson Jr. ("Jackson"). Jackson files this Response in opposition to Defendant's Motion for Summary Judgment. For the reasons given therein, and based also on the supporting materials submitted in the accompanying exhibits to this Response, Jackson respectfully requests that summary judgment be denied on the following specific issues:

## II.     STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

In presenting this Response, Jackson respectfully asks the Court to determine the following:

### Issue 1:

A plaintiff can establish his *prima facie* race discrimination claim if he can demonstrate that he was treated differently than similarly situated employees outside his protected class under nearly identical circumstances, or that he was replaced by someone outside the protected class, or he was otherwise discharged due to his protected class status. (**Footnote 1** ). **Whether Jackson can demonstrate that similarly situated White/Caucasian Engineer/Conductors were treated differently than Jackson under nearly identical circumstances?**

### Issue 2:

A plaintiff employee can prevail on a race discrimination claim when the plaintiff presents evidence of pretext. (**Footnote 2**). **Whether Jackson can meet his burden of showing that BNSF's proffered reason for his termination was a pretext.**

---

**1** *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ; *EEOC v. DYNMCDERMOTT Petroleum Operations Co.*, 537 F. App'x 437, 443
**2 In the summary-judgment setting, however, the plaintiff need not prove pretext, but need merely establish a genuine issue of material fact on the matter.** *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991).

## III.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

Jackson respectfully requests that, pursuant to Federal Rules of Civil Procedure 56, the Court deny BNSF's Motion for Summary Judgment in its entirety.

Jackson was subject to race discrimination when White members of BNSF Management subjected him too much harsher discipline compared to his similarly situated White Engineer/Conductor coworkers: Jason Elliot (White), Michael Godfrey (White), V. B. Harris (White), Nancy Shapley (White) and Jasper Stanley (White). (**Footnote  3**). This case is not about whether Jackson was guilty of any of the alleged infractions; it is whether he was disciplined in an unequal manner, under nearly identical circumstances, compared to his similarly situated White coworkers, when he received various progressive discipline and was terminated. The Arbitrator (Public Law Board, "PLB"), in ruling against BNSF, found BNSF's actions in handling Jackson's discipline to be suspicious and so could a jury.

## FACTUAL BACKGROUND

### A.   Jackson Employment Background with BNSF

Jackson began his employment with BNSF on or about 2007 as a Conductor. (Exhibit 1: "Plaintiff Dewaine Jackson Declaration", pg. 1, Para. 2). Jackson has worked as a Locomotive Engineer for BNSF since 2011. *Id*. Jackson transferred from Chicago to the Red River Division in Houston, TX on or about May 2017. (Exhibit 1, pg. 1, Para. 3).

---

**3** Plaintiff Jackson Exhibit 29, attached to this Response, is a list of Jackson's coworkers identified in this Response that shared the same Supervisors as Jackson.

During the entire time period Jackson was employed by BNSF at the Red River Division, General Manager Janssen Thompson (White) has always been a part of his management chain. (Exhibit 1, pg. 1, Para. 4). Mr. Thompson was and still is a supervisor over Jackson's similarly situated coworkers Jason Elliot (White), Michael Godfrey (White), V. B. Harris (White), Nancy Shapley (White) and Jasper Stanley (White).

### B.     Jackson Receives Level S Discipline in July 2017

Before coming down to Texas, Jackson had worked over five (5) years without any discipline on his record. (Exhibit 1, pg. 1, Para. 5). However, Jackson received a Level S 30 Day Record Suspension with a **36-month review period** on his first trip out of training. (Exhibit 1, pg. 1, Para. 6). Jackson was given extremely harsher discipline for a first time offense than any of the five similarly situated White coworkers identified on the chart, which is attached as Plaintiff Jackson Exhibit 2 to this Response. (Exhibit 1, pg. 1, Para. 6, and Exhibit 2). According to the Policy for Performance and Accountability ("PEPA"), with nothing on his record, Jackson should have been afforded an Alternative Handling with a 12-month review period for this incident. *Id* and (Exhibit 26: "PEPA Policy", pg. 001150). The much lesser punishment of Alternative Handling wasn't given to Jackson even though the Engineer admitted fault for not listening to him. (Exhibit 1, pg. 1, Para. 6). Jackson's similarly situated coworker Mr. Jason Elliott had something on his record for seven straight years, but never received a 10, 20, 30-day Record Suspension, or even a Level S. (Exhibit 1, pg. 2, Para. 7, Exhibit 2, pp. 003286 to 003287 and Exhibit 3: "Deposition Transcript of Jason Elliott", pg. 20).

3

### C.     Jackson is Discharged for Falsification of his FMLA Leave Paperwork

In regards to Jackson's termination based on BNSF's allegations of dishonesty regarding his FMLA paperwork, the last page of the FMLA packet has an employee acknowledgement and certification section. (Exhibit 1, pg. 2, Para. 8, Exhibit 9 Part 2, pg. 002232). It implies that an employee will be disciplined if he or she makes any false or misleading statements. (Exhibit 1, pg. 2, Para. 8). While trying to re-certify this packet, Jackson sent it over to the Employee Services/HR. *Id.* Employee Services/HR required Jackson to make changes and/or corrections three out of the four times the packet was submitted. *Id*. The fourth time it was returned by HR to Jackson was because it was not signed. *Id*. Jackson was waiting for the final approval of the packet before officially signing off on it. *Id*.  Jackson and Employee Services/HR were in discussions regarding a particular document that was not finalized.  (Exhibit 1, pg. 2, Para. 8). However, BNSF still felt that Jackson should be terminated over a discrepancy on the document. (Exhibit 1, pg. 2, Para. 8).

BNSF Employee Services/HR sent an email to Jackson stating the following: "To follow up on our phone conversation this afternoon, we can't accept the same dates listed on a previous FMLA application. **Please you're your provider** initial and date the corrections on the certification form and fax back to our office at 817-352-3672." (Exhibit 1, pg. 2, Para. 10, and Exhibit 9, Part 2, pg. 002224). Jackson was very confused at that time with all the back and forth with Employee Services/HR. (Exhibit 1, pg. 3. Para. 10). Jackson genuinely believed that Employee Services/HR was telling him that he

4

was his provider for the purposes of that document. Jackson read "you're" as being "you are" because "you're" is short for you are. (Exhibit 1, pg. 3. Para. 10). Jackson only followed the directions that were given to him by BNSF. *Id*. It was an honest mistake. *Id*.

Jackson literally followed the instructions given to him by Employee Services/HR, and sent in blood tests, prescriptions that had new dates to back up the change of the dates on the FMLA packet. (Exhibit 1, pg. 3, Para. 11). The dates that Jackson put on the document in question were actual dates that he sought medical treatment when his usual doctor was out of town. (Exhibit 1, pg. 3, Para. 11). So how can Jackson falsify a document that BNSF instructed him to initial and date himself? Yet Jackson was still investigated and terminated based on allegations of dishonesty regarding his FMLA paperwork.

Jackson was terminated while his similarly situated White coworker Jason Elliott had a manager overturn discipline regarding two charges of dishonesty levied against him. (Exhibit 1, pg. 3, Para. 14). For the discipline Jackson received regarding his FMLA paperwork, Mr. Elliott and Jackson both had the same representation from the union, had investigations in the same room, and both had Kim Sauceda and Janssen Thompson as the discipline officials representing BNSF. (Exhibit 1, pp. 3-4, Para. 14). Aaron Peterson was also Mr. Elliott's supervisor when Mr. Elliott was accused of dishonesty regarding the reporting of his car mileage. (Exhibit 1, pg. 4, Para. 15).

**D.     Jackson is Reinstated After the Arbitrator (PLB) Ruled Against BNSF After Jackson Filed His Appeals**

On or about July 19, 2017, an investigation was held regarding BNSF's accusation that Jackson failed to stop for a signal on July 6, 2017. (Exhibit 15: "Transcription of Investigation Held on 07/19/2017 (Jackson)", pp. 002303 to 002348).

On or about July 24, 2017, Aaron Peterson sent notice to Jackson that he was receiving a Level S 30 Day Record Suspension with 36 month (3 Years) Review Period for the allegation that he failed to stop for a signal on July 6, 2017. (Exhibit 16: "July 24, 2017 Letter of "Level S 30 Day Record Suspension" of Jackson", pg. 002302).

On or about August 24, 2017, an investigation was held regarding BNSF's accusation that Jackson falsified his FMLA paperwork. (Exhibit 9 Part 1: "Transcription of Investigation Held on 08/24/2017 (Jackson)" and Exhibit 9 Part 2: "Corresponding Exhibits to 08/24/2017 Investigation").

**After Jackson's investigation, he asked his supervisor Aaron Peterson, who was the Galveston Terminal Manager at the time, for help**, to stand up and admit this was a mistake and that he was a good employee. (Exhibit 1, pg. 3. Para. 13). **Mr. Peterson told Jackson that he was told to stay out of it from his boss.** *Id*. **Please note that Mr. Peterson's boss, a that time, was also Janssen Thompson.** *Id*. Mr. Peterson went on to tell Jackson, "it was a huge miscommunication but the railroad can afford to be wrong, the question is can I?" *Id*.

On or about September 5, 2017, Jackson received notice form Aaron Peterson informing Jackson that he was being dismissed for "falsification of FMLA Leave

6

application…" (Exhibit 10: "September 05, 2017 Letter of Jackson "Dismissal", pg. 002177).

On or about October 30, 2017, Jackson filed his appeal to General Manager Janssen Thompson to be reinstated. (Exhibit 11: "October 30, 2017, Jackson Appeal for Reinstatement", pg. 002240-002241).

Mr. Thompson by letter dated November 20, 2017 declined Jackson's Appeal for Reinstatement. (Exhibit 12: "Janssen Thompson Letter Denying Appeal", pg. 002243).

On or about May 18, 2018, Jackson appealed BNSF's decision to punish him with a Level S 30 Day Record Suspension with 36 month (3 Years) Review Period for the allegation that he failed to stop for a signal on July 6, 2017. (Exhibit 17: "May 18, 2018, Jackson Appeal of "Level S 30 Day Record Suspension" of Jackson", pp. 002392 to 002393).

On or about May 18, 2018, Jackson appealed BNSF's decision to terminate him to the Arbitrator. (Exhibit 13: "May 18, 2018 Jackson Appeal of "Dismissal" to Arbitrator", pp. 002244-002246).

On or about February 20, 2020, Arbitrator Peter R. Meyers made the following ruling regarding Jackson's dismissal for allegations that Jackson falsified his FMLA Leave application:

"The Claimant in this case was terminated for his wrongdoing. **There were substantial mitigating factors that were developed during the hearing which made it clear that the Carrier acted unreasonably and arbitrarily when it terminated the Claimant's employment for this rule violation. Therefore, we order that the Claimant be returned to work *without back pay*.** The period of time that Claimant was off work shall be considered a lengthy Level S disciplinary suspension." (Exhibit 14: "Arbitrator

Decision Overturning BNSF Dismissal of Jackson", pp. 002398 to 002399).

On or about February 20, 2020, Arbitrator Peter R. Meyers made the following ruling regarding BNSF's decision to punish Jackson with a Level S 30 Day Record Suspension with 36 month (3 Years) Review Period for the allegation that he failed to stop for a signal on July 6, 2017:

"The Claimant in this case was issued a Level S thirty-day record suspension for his wrongdoing. **Given the mitigating circumstances that are apparent in the record, this Board finds that the Carrier acted unreasonably, arbitrarily, and capriciously when it issued that disciple to the Claimant.** Therefore, we order that the discipline be reduced to a standard discipline and the Level S thirty-day record suspension be removed from the Claimant's record." (Exhibit 18: "Arbitrator Decision Overturning BNSF "Level S 30 Day Record Suspension" of Jackson", pp. 002395 to 002396).

A jury could also find by a preponderance of the evidence that BNSF unreasonably and intentionally discriminated against Jackson by reviewing the Transcripts of Investigation, Jackson's Appeals and by comparing BNSF's discipline of Jackson to BNSF"s discipline of the comparators identified in this Response. (Exhibit 2, Exhibit 9 Part 1: "Transcript of Investigation Held on 08/24/2017 (Jackson)", Exhibit 9 Part 2: "Corresponding Exhibits to 08/24/2017 Investigation", Exhibit 15: "Transcript of Investigation Held on 07/19/2017 (Jackson)", Exhibit 11, Exhibit 13 and Exhibit 17). **However, for the purposes of this Response, Jackson need not prove pretext but Jackson has made the required showing that genuine issues of material fact exist as to pretext.** *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991).

### E.      Jackson's Engineer Transfer Request Not Immediately Approved

Jackson first put in for his engineer transfer from Chicago to Houston on or about January/February of 2020, after his employment with BNSF was reinstated. (Exhibit 1, pg. 4, Para. 16). While waiting on his transfer, Jackson reached out to Janssen Thompson, Jason Jenkins, Kim Sauceda, and both unions in Chicago and Houston. (Exhibit 1, pg. 4, Para. 16).   Both Mr. Thompson and Mr. Jenkins informed Jackson that his transfer was denied. *Id.* Ms. Sauceda only answered one of Jackson's emails but didn't reply to his return email and still hasn't returned any of his calls to this day. SJ Smith (White) and J Meyers (White) received their transfers in less than 30 to 45 days after they put their paperwork in. *Id.* Jackson was denied the transfer for twelve months and was only granted the transfer soon after he filed the lawsuit in the present matter. *Id.* Also, when SJ Smith received his transfer, he was on a Level S Suspension. As such, pursuant to BNSF policy, SJ Smith should not have received a transfer while serving that suspension. *Id.*

By email dated December 5, 2020, Janssen Thompson denied Jackson's transfer stating, "Mr. Jackson was reinstated back to work by PLB on a leniency basis with an active Level S in late December 2019. Recognize he is working in Galveston, however expect him to still prove his behavior, before allowing him to transfer his Engineer's Seniority. We will consider his transfer in the 1st Quarter; provided he remains incident/discipline free." (Exhibit 27: "Janssen Thompson December 5, 2020 Email Denying Jackson His Transfer of Engineering Seniority to Houston from Chicago").

Delaying the transfer of Jackson's engineer card handicapped his ability to work jobs in Houston and Galveston. (Exhibit 1, pg. 4, Para. 17). Jackson saw many setback Engineers getting called for extra work when the Engineer boards would get exhausted. *Id*. When you're a setback Engineer working as a Conductor, if BNSF calls you for extra work, you are given an extra monetary bonus when you accept the call. *Id.* Jackson would see many of his coworkers getting called for extra work, while BNSF would run around him because he didn't have his engineer card. (Exhibit 1, pg. 4, Para. 17).  JR Burnett (White) at the time was making close to $3,000 more a month doing extra work. *Id.* Jackson also lost out on profit sharing (monetary bonus) that was given out every January for working as an Engineer the previous year. *Id.*

## F.     Jackson Receives "Coach and Counseling" for a PTC Penalty

On or about April 21, 2021, on the second day after Jackson began working as an Engineer, he was driving a heavy coal train down a hill when the secondary braking system began to fail. (Exhibit 1, pg. 4, Para. 18).  Although Jackson followed the required protocols, his Road Foreman (Carol LaBlanco, White) still gave him progressive discipline in the form of a "Coach and Counseling." *Id*. However, TS Praitt (White) and TW Ferguson (White) have done exactly the same thing that Jackson received a Coach and Counseling for, on multiple occasions, but they did not receive any discipline. *Id*. To Jackson's knowledge, he was the first person employed by BNSF in Galveston or Houston to receive a Coach and Counseling for the type of actions he took on April 21, 2021. *Id.* Coach and Counseling is an extremely minor form of discipline that no one gets

cited for PTC suppression issues, that is why it was very petty of BNSF to discipline Jackson for something that happens all the time to all Engineers/Conductors.

### G.    Jackson Accepts Alternative Handling for Derailing an Engine

On or about July 27, 2021, Jackson was disciplined with a form of progressive discipline called "Alternative Handling" for derailing a locomotive on or about June 15, 2021. (Exhibit 1, pg. 4, Para. 19).  Jackson was called to work at the Casey yard in Houston, Texas as an Engineer. Jackson notified crew caller, Robert Johnson (Yard Master, White), and Jill Baker (Train Master, White), that he wasn't familiar with the Casey yard. (Exhibit 1, pg. 5, Para. 19).  To no avail Jackson was still sent to work the job. *Id*. While working a job that he had never worked on as an Engineer or Conductor, a derail was ran over, which immobilized a BNSF locomotive. *Id*. Jackson was disciplined with an Alternative Handling along with his Conductor Clayton Smith (White) even though Mr. Smith had control of the movement. *Id*. When a train derails, the person controlling the movement receives the discipline. *Id*. Jackson's June 15, 2021 derail was under nearly identical circumstances as Mr. Godfrey's derail on September 14, 2021, yet Jackson was told that he must share his discipline with the person who was in control of the movement. *Id*.

Just three months later on or about September 14, 2021, Mr. Godfrey in the capacity as an Engineer ran over the same derail Jackson did, in the same Casey yard. (Exhibit 1, pg. 5, Para. 20).  The only difference between Mr. Godfrey and Jackson was that Mr. Godfrey had control of the movement. *Id*. Which means Mr. Godfrey was on the

head locomotive, could see the direction he was moving, and could stop and avoid any obstacles in his path. *Id*. Mr. Godfrey also received an Alternative Handling, but his Conductor received no discipline. *Id*. So, Godfrey had control of the movement and didn't have to share discipline with his Conductor. *Id*. However, Jackson didn't have control of the movement and was given a directive to follow by Mr. Smith, but he received the same discipline as Mr. Smith, who had control of the movement in the same yard and derail as Mr. Godfrey. *Id*. The discipline for both Mr. Godfrey and Jackson was all handled by the same supervisor (Ross Molyneaux) in the same Red River Division. (Exhibit 1, pg. 5, Para. 20 and Exhibit 2, pg. 003288 and pg. 003292). Also, Mr. Godfrey was only charged with one GCOR rule violation, while Jackson, who didn't even control the movement of the train, was charged with five rule violations, including but not limited to a GCOR Rule 1.6 Serious Violation, for derailing a train in the same yard as Mr. Godfrey's September 14, 2021 derailment, in the same Red River Division, and under the same managers (Ross Molyneaux and Janssen Thompson). *Id*.

From on or about April 5, 2018 to September 16, 2021, Mr. Godfrey was disciplined six (6) times. (Exhibit 2, pp. 003287 to 003288). Of the six times Mr. Godfrey was disciplined he received four (4) Alternative Handlings. *Id*. The other two forms of discipline Mr. Godfrey received were Formal Reprimands, which are a lower form of discipline than an Alternative Handling. *Id*. Jackson has never received two Alternative Handlings in his whole career with BNSF and he has never received a Formal Reprimand. (Exhibit 1, pg. 5, Para. 21). Jackson's evidence, attached to this Response,

proves that BNSF afforded his similarly situated White Engineer/Conductors much more lenient discipline compared to him.

On or about May 20, 2022, Jackson was informed by his union's Local Chairman Mr. Dwayne Martin that Mr. Godfrey was recently promoted to the position of Safety Coordinator over the Houston Region. (Exhibit 1, pg. 6, Para. 24). Mr. Godfrey was promoted despite his laundry list of transgressions, discussed in detail in the Argument section of this Response.

### H.    Jackson Discriminatory Work Environment Allegations

Jackson first started noticing "HH", "KKK", "The OK Hand Signal"(hand gesture for white power), and "MAG" on the desk on his engineer workstation or around it. (Exhibit 1, pg. 5, Para. 23).  Jackson started to see it more and more often and started taking pictures of it.  *Id.* HR began to ask Jackson questions about these racially charged markings in June 2021. *Id*. The response from HR was that they don't believe that HH stands for Heil Hitler even though many of the pictures that Jackson sent in had stop hate written right next to it. *Id.* What else can KKK stand for? This has taken a huge mental toll on Jackson having to look at these markings day in and day out especially with how he has been treated by BNSF.  *Id*. Most of the locomotives with these markings have cameras so BNSF can see who is putting these markings on Jackson's workstation, but BNSF and their HR department don't care to do anything about it. *Id.*

## IV.    STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure summary judgment is appropriate when the pleadings and record evidence show that no genuine issues of material facts exist and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "Although summary judgment is not favored in claims of employment discrimination, it is nonetheless proper when 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Waggoner v. City of Garland*, 987 F.2d 1160, 1164 (5th Cir.1993) (quoting Fed.R.Civ.P. 56(c)). In making a summary judgment determination, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir.2000). Because credibility determinations are the exclusive province of the jury, the law is clear that a court may not make credibility determinations or weigh the evidence when deciding whether to grant summary judgment. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 653 (5th Cir. 2002).

## V.    ARGUMENT AND AUTHORITIES

### A. Jackson has Satisfied the *Prima Facie* Elements of Race Discrimination Under Section 1981

In discrimination cases based on circumstantial evidence that have not been fully tried on the merits, this Court applies the burden-shifting analysis established by the United States Supreme Court. *See Reeves at* 530 U.S. at 142–43, 120 S. Ct. at 2106; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 1093–94

14

(1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 1824–25 (1973). Under the burden-shifting analysis, the plaintiff has the initial burden to come forward with evidence establishing a *prima facie* case of discrimination. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106.

To establish a *prima facie* case of race or color discrimination based on disparate treatment a plaintiff must show that he was (1) a member of a protected class, (2) qualified for the employment position at issue, (3) subject to an adverse employment action, which includes termination, and (4) treated less favorably than similarly situated members outside of the protected class, *or* that the plaintiff was replaced by someone outside the protected class, *or* was otherwise discharged due to he protected class status. *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097; *DYNMCDERMOTT Petroleum Operations Co.* at 443; *Machinchick* at 350.

The plaintiff's establishment of a *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094. If the plaintiff is successful in making a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its rejection of the plaintiff. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106.

Once an employer produces sufficient evidence to support a non-discriminatory explanation for its decision, a plaintiff must be afforded the opportunity to show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106 (citing *Burdine*, 450 U.S.

15

at 253, 101 S. Ct. at 1093). That is, a plaintiff may attempt to prove that he was the victim of intentional discrimination "by showing that the [defendant's] proffered explanation is unworthy of credence." *Id.* Although the presumption of discrimination disappears once the defendant meets its burden of production, **it is still proper to consider the evidence establishing the plaintiff's pri*ma facie* case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.**" *Id.* In the present matter, the same evidence that Jackson is using to establish a *prima facie* case is also the same evidence he is using to establish that the reasons given by BNSF for its adverse actions against him are pretextual. Namely BNSF's intentional refusal to equally administer discipline to Jackson compared to the similarly situated White coworkers identified in this Response.

### B. BNSF's Alleged Reasons for Terminating Jackson are Pretext for Race Discrimination.

#### 1. Unequal Discipline of Jason Elliott (White/Caucasian Engineer/Conductor)

Mr. Elliott testified that he was employed by BNSF for ten years and three months and for most of those years he had some sort of discipline on his record. (Exhibit 3, pg. 20). From on or about August 19, 2018 to October 29, 2020, Mr. Elliott was charged with nine (9) violations. (Exhibit 2, pp. 003286 to 003287 and Exhibit 21, pp. 003519 to 003631). Ultimately one Serious Violation for dishonesty was thrown out and Mr. Elliott had two Cancelations. *Id*. During the same period of time, Jackson has only been subject to discipline three (3) times, yet Jackson was terminated based on allegations of

dishonesty, while Mr. Elliott was not terminated even though he was accused of two (2) separate serious allegations of dishonesty.

Mr. Elliott testified that he listened to the two recordings that are attached as Exhibit 7 and Exhibit 8 to this Response two days prior to his deposition on March 31, 2022. (Jason Elliott Deposition Transcript attached as Exhibit 3 to this Response, pg. 6). Mr. Elliott confirmed that it was he and Jackson who were speaking on the two recordings and also confirmed that everything he said on both audio recordings was truthful and accurate. (Exhibit 3, pp. 6-7 and pp. 16-17 and pp. 23-25).

Mr. Elliott further confirmed that he received the July 31, 2019 allegation of dishonesty in violation of a BNSF policy called the General Code of Operating Requirements (GCOR) 1.6, which is attached as Exhibit 20 to this Response. (Exhibit 3, pp. 7-8 and Exhibit 20: "Jason Elliott Documentation evidencing that 'No Discipline' was Given to Elliott for Allegations of Dishonesty for Falsifying a Document", pg. 003615 and pp. 003617-003618).

Mr. Elliott testified that the Director of Administration Kim Sauceda was going after him for the allegations of dishonesty. (Exhibit 3, pg. 10, Exhibit 5: "Transcription of Audio File: jgelliot2", pp. 2-7, and Exhibit 8 at 1 min 53 sec.). Mr. Elliott testified that he felt like Ms. Sauceda was trying to get him terminated. (Exhibit 3, pg. 14). In BNSF's dismissal action against Jackson's Ms. Sauceda was also gunning for his termination but Mr. Thompson did not intervene on Jackson's behalf like he did on behalf of Mr. Elliott.

Mr. Elliott testified that at the time of his deposition that he wasn't sure of Mr.

17

Janssen Thompson's involvement with the July 31, 2019 allegation of dishonesty even though on the recorded conversation (Audio File jgelliot2 attached to this Response as Exhibit 8, at 3 min 42 sec. and 5 min 29 sec.). Mr. Elliott testified:

> "Q. What we just – what you just heard I would say about 5:29 of the tape, or the recording, is it – do you – did you hear yourself saying that Janssen basically said there's no way to validate her claim of me falsifying a document. Is that what you said?
>
> A. That's what I said.
>
> Q. Okay. So you didn't – you didn't say that I think Janssen basically said anything, correct?
>
> A. I didn't.
>
> Q. Okay. You affirmatively said that you thought Janssen Thompson said, correct?
>
> A. Yes. That's correct.
>
> Q. The only – the only reason I –
>
> (Audio played.)
>
> BY MR. BAIL:
>
> Q. So right then, is that your testimony? Did that – strike that. Did you hear you're just – yourself telling my client that the 1.6 violation for dishonesty when you allegedly submitted a falsified document, you received no discipline for it; is that correct?
>
> A. That's correct.
>
> Q. And according to the recording – according to what you said on the recording it got thrown out because of Janssen Thompson, correct?
>
> A. That's correct.
>
> Q. Okay. But yet today, yours – your testimony is, earlier today is that you're not sure – sure what happened as far as Janssen Thompson is concerned, correct?
>
> A. That's correct. I – I have a different understanding of how discipline is reviewed to the company now.
>
> Q. Okay. And that's after speaking to the attorneys that represent BNSF, correct?
>
> A. That's correct."
>
> (Exhibit 3, pp. 15-16)

Indeed, Mr. Elliott clearly stated in the recorded conversation with Jackson that Janssen Thompson considered the charges against Mr. Elliott regarding the falsification

of AT&T paperwork and Mr. Thompson's "response was, we can't validate this, you're saying that; he's just like dismiss it." (Exhibit 5, pg. 6 and pg. 8 and Exhibit 8 at 3 min 42 sec. and at 5 min 29 sec.).

Page 003618 of Exhibit 20, attached to this Response, evidences BNSF's dismissal of the allegation against Mr. Elliott for dishonesty when he submitted a falsified document to BNSF on July 30, 2019. The information contained in the red box on pg. 003618 of Exhibit 20 to this Response reads as follows: "Recommendations: Daren I reviewed Mr. Elliott's investigation transcript and discipline record. ***Although the document is certainly suspicious*. I don't believe that we proved the dishonesty. Therefore, discipline is not supported by this violation**." (Exhibit 20, pg. 003618). **Here, even though BNSF, specifically Mr. Thompson, found Mr. Elliott's actions to be "certainly suspicious", BNSF gave Mr. Elliott zero discipline**!

Mr. Elliott testified that the information contained on pg. 003618 of Exhibit 20 to this Response, regarding what was contained in the red box on that document, is consistent with what he attributed to Janssen Thompson's involvement of getting this charge dismissed, on the recording attached as Exhibit 8 to this Response. (Exhibit 3, pp. 17-18). Mr. Thompson interjected on Mr. Elliott's behalf and was instrumental in having Mr. Elliott's charge dismissed. However, in Jackson's case Mr. Thompson was instrumental in terminating Jackson and denying his appeal regarding allegations that Jackson falsified FMLA documentation.

Mr. Elliott, *other* GCOR 1.6 violation for dishonesty, during the relevant

time-period, is not identified in the chart of comparator employees that BNSF provided Plaintiff during discovery of this matter. However, Mr. Elliott discussed this violation on a recorded conversation and during the course of his recent deposition.  (Plaintiff Jackson Exhibit 7: "Audio File "jgelliott1" at 7 min. 11 sec. and please also see Exhibit 4: "Transcription of Audio File "jgelliott1", pp. 5-7).

Mr. Elliott stated in the recording that he received only a Formal Reprimand for a GCOR 1.6 violation for dishonesty, for reporting mileage from the BNSF Galveston, Texas location to the BNSF Sealy, Texas location when he should have claimed mileage from his home to Sealy, Texas.    (Exhibit 4: "Transcription of Audio File: jgelliott1", pp. 5-7, pg. 11 and Exhibit 7 at 7 min. 11 sec.). Mr. Elliott stated that BNSF wanted to fire him for the mileage issue. (Exhibit 4, pg. 6).

Mr. Elliott testified that he was accused of dishonesty in the year 2017 or 2018 regarding the reporting or car mileage charge. (Exhibit 3, pp. 20-21.) **Mr. Elliott testified that his supervisor for the allegation of dishonesty regarding the reporting of his car mileage was Aaron Peterson the Terminal Manager for Galveston.** (Exhibit 3, pp. 21-22). **Aaron Peterson was also Jackson's supervisor at the time he was terminated for allegations of dishonesty with his FMLA paperwork.** (Exhibit 1, pg. 3, Para. 13 and Exhibit 10, pg. 002177).

Mr. Elliott testified that a supervisor by the name of Bob Bomeo, "stood by me, I guess. And he contacted the – the terminal manager out of Galveston to see if there was something that they could work out." (Exhibit 3, pp. 21-22 and Exhibit 4, pg. 18-20).

Regarding the allegations against Mr. Elliott for dishonesty in reporting car mileage, After Bob Bomeo spoke to Aaron Peterson, Mr. Peterson downgraded Mr. Elliott's discipline to an Alternative Handling. If Mr. Elliott was Black he would have been fired a long time ago, but yet again BNSF chose to coddle Mr. Elliott with his discipline but were extremely punitive when it came to disciplining Jackson.

### 2.    Unequal Discipline of Michael Godfrey (White/Caucasian Engineer/Conductor)

On or about April 5, 2018, Mr. Godfrey was disciplined for putting his train in emergency mode on January 12, 2018, *and* for not notifying the dispatcher that he had placed his train in "emergency" mode. (Exhibit 2, pg. 003287 and Exhibit 23: "Discipline of Michael Godfrey from May 9, 2017 to December 31, 2021", pp. 003648 to 003650). However, Mr. Godfrey was not charged with a GCOR 1.6 dishonesty violation, even though he tried to hide the fact that he had to apply the emergency brake application to avoid getting by a signal, which was another violation he was trying to avoid. Mr. Godfrey was guilty of every GCOR violation he was charged with, but he only received an Alternative Handling with no review period. (Exhibit 2, pg. 003287 and Exhibit 23, pp. 003649 to 003650). According to BNSF's Policy on Employee Performance Accountability Policy ('PEPA') C1a, any rules, that are identified in departmental publications (GCOR), that are broken should be given a Level S. (Exhibit 26, pg. 001150). Mr. Godfrey was caught breaking many rules and tried to hide his mistake but only received an Alternative Handling. *Id*. Mr. Godfrey did not announce or tell his supervisor about the emergency action, which is dishonesty, but he wasn't even charged

with being dishonest!

On or about April 23, 2018, Mr. Godfrey was disciplined for missing a call on March 15, 2018. (Exhibit 2, pg. 003288 and Exhibit 23, pp. 003651 to 003653). However, Mr. Godfrey only received an Alternative Handling, again with no review period. *Id*. Per the PEPA Policy, a second Standard Violation, in a twelve-month review period, will result in a Record Suspension of 10 days. (Exhibit 26, pg. 001150). However, in just a two-month period, Mr. Godfrey was given the same discipline twice. Jackson has never received two Alternative Handlings in his entire career with BNSF. (Exhibit 1, pg. 5, Para. 21). Prior to coming to the Red River Division of BNSF, Jackson had a clean record for five years but received a Level S 30 Day Record Suspension on his first trip after the required training period, basically his first day on the job for the Red River Division. (Exhibit 1, pg. 1, Para. 5). According to the PEPA Policy C2a., for the discipline Jackson received on July 24, 2017, he should have received a review period of 12 months instead of 36 months, because he had received no discipline since 2011. (Exhibit 26, pg. 001150). **However, BNSF chose to give Jackson a Level S 30 Day Record Suspension, with a highly punitive review period of 36 months, even though Jackson received no discipline for approximately 5 years. None of the 5 comparator employees, identified in the chart provided to Jackson in discovery of this matter, received any Serious Violations (Level S) or anything over a 12-month review period.** (Exhibit 2, pp. 003286 to 003292).

On or about September 8, 2020, Mr. Godfrey is once again charged for missing a

call, which is considered an attendance violation by BNSF. (Exhibit 2, pg. 003288 and pp. 003654 to 003655). The same offense Mr. Godfrey did on March 15, 2018, but instead of receiving an Alternative Handling or higher discipline, he is only given a Standard Formal Reprimand with a 12-month review period. *Id*. **This incident was handled by Kim Sauceda and Supervisor Ross Molyneaux.** *Id*. So, Mr. Godfrey did the same thing twice and received different discipline each time.   In fact, the second time the discipline was downgraded. **A Formal Reprimand is below an Alternative Handling and is considered by BNSF to be such a minor form of discipline that it isn't included on the PEPA Policy.**

On or about November 10, 2020, Mr. Godfrey was disciplined again for another violation of BNSF's attendance policy in October 2020. (Exhibit 2, pg. 003288 and Exhibit 23, pp. 003656 to 003657).   For this offense Mr. Godfrey was only given a Standard Formal Reprimand, but he should have received a Record Suspension of 10 days because this was his second Standard Violation, in a 12-month review period. *Id* and (Exhibit 26, pg. 001150).   However, Mr. Godfrey gets the lowest amount of discipline he can receive, only three months after making the same mistake over again! Again, Jackson had a clean record for approximately five years, but on his first infraction, Jackson received a Level S 30 Day Record Suspension, **with a review period of 36 months,** even with the Engineer admitting fault for that incident.   Mr. Thompson didn't want to give Jackson a transfer because of his alleged behavior even though Jackson had gone 13 months with no incidents. (Exhibit 27). On the other hand Mr. Godfrey, despite a laundry

list of charges against him, just received promotion that Mr. Thompson needed to sign off on. (Exhibit 1, pg. 6, Para. 24).

On or about February 25, 2021, Mr. Godfrey was disciplined for running thru a switch. (Exhibit 2, pg. 003288, Exhibit 23, pp. 003660 to 003662).   Mr. Godfrey was in control of the movement but was only given an Alternative Handling with no review period. *Id*. According to PEPA Policy B3a., the minimum discipline Mr. Godfrey should have received is a Record Suspension of 20 days because this was his third Standard Violation within a 12-month review period. (Exhibit 26, pg. 001150). Instead, BNSF still only gave Mr. Godfrey extremely mild discipline.  Also of note, is that the Conductor involved with this incident was given no discipline because Mr. Godfrey was in control of the movement.   (Exhibit 1, pg. 5, Para. 20).

On or about September 16, 2021, Mr. Godfrey received discipline for derailing a motor on September 14, 2021. (Exhibit 2, pg. 003288 and Exhibit 23, pp. 003663 to 003664). Although Mr. Godfrey was in control of the movement, he only received an Alternative Handling with no review period. (Exhibit 2, pg. 003288 and Exhibit 23, pg. 003664). However, Mr. Godfrey's Conductor, on this incident, received no discipline which is the exact opposite of how Jackson was treated in regard to the discipline he received for his derail on June 15, 2021. (Exhibit 1, pg. 5, Para. 20 and Exhibit 2, pg. 003292).  When a train derails, the person controlling the movement receives the discipline. (Exhibit 1, pg. 5, Para. 19). In Jackson's June 15, 2021 derail, under nearly identical circumstances, Jackson was told that he must share his discipline with the

person who was in control of the movement. *Id*. **Also, Mr. Godfrey was only charged with one GCOR rule violation, while Jackson, who didn't even control the movement of the train, was charged with five rule violations, including but not limited to a GCOR Rule 1.6 violation, for derailing a train in the same yard as Mr. Godfrey's September 14, 2021 derailment, in the same Red River Division, and under the same managers (Ross Molyneaux and Janssen Thompson)**.   (Exhibit 2, pg. 003288 and pg. 003292). Once again, according to the PEPA Policy B3a., Mr. Godfrey should have received a Record Suspension of 20 days because this was his third Standard Violation within a 12-month review period. (Exhibit 26, pg. 001150).

The above comparison of Jackson's discipline and Mr. Godfrey's disciplinary record, during the relevant time-period, is a stark example of unequal treatment afforded to Jackson compared to his similarly situated White coworkers. **On the one hand BNSF does not follow its own policies to the benefit of White Engineers/Conductors, and on the other hand BNSF also chooses not to follow their own policies to the detriment of Black Engineers/Conductors, specifically Jackson in the present matter**.   If Mr. Godfrey was Black, he would have been fired by now, or at the very least given a Level S 30 Day Record Suspension.   However, Mr. Godfrey hasn't received anything more than an Alternative Handling, for multiple infractions over a very short time-period. Yet Jackson received a Level S 30 Day Record Suspension, with a review period of 36 months, on the very first day he was working in the Red River Division following his training, even though Jackson had received no discipline for approximately

25

5 years prior.

### 3. Unequal Discipline of V. B. Harris Jr. (White/Caucasian Engineer/Conductor)

On or about June 13, 2017, V. B. Harris Jr. received discipline for failure to comply with a stop signal on June 2, 2017. (Exhibit 2, pg. 003288 and Exhibit 25, pp. 003675 to 003677). Mr. Harris received an Alternative Handling with no review period for this violation. *Id.*

On or about July 30, 2018, Mr. Harris received discipline for failure to comply with a stop signal on July 30, 2018. (Exhibit 2, pg. 003289 and Exhibit 25, pg. 003679). Mr. Harris was given a Level S 30 Day Record Suspension with ***only* a 12-month review period.** (Exhibit 25, pg. 003679). **However, on July 24, 2017, Jackson with nothing on his record for 5 straight years, was given a Level S 30 Day Record Suspension, with a review period of 36 months for the exact same type of infraction that V. B. Harris was given an Alternative Handling for the first occasion and a Level S 30 Day Record Suspension with *only* a 12-month review period for subsequent infraction**. (Exhibit 2, pg. 003289 and pg. 003291 and Exhibit 25, pg. 003679). It should be noted that BNSF considers a Level S to be "Serious Violations" and Record Suspensions are considered much less severe "Standard Violations." (Exhibit 26, pg. 001150). Astonishingly, Jackson received a much harsher penalty and review period for something Mr. Harris did twice during a 13-month period. The only reason Jackson's review period was ultimately dropped to 12 months was because the Arbitrator ruled against BNSF on that issue. (Exhibit 18: Arbitrator Decision Overturning BNSF "Level S30 Day

Record Suspension of Jackson, at pg. 002396). In Jackson's whole career he has never seen a Black Engineer/Conductor run two signals and keep their job. (Exhibit 1, pg. 5, Para. 22). Kim Sauceda was involved with both infractions of Mr. Harris described above. (Exhibit 25, pp. 003675 to 003679).

On or about August 8, 2018, only around 20 days after he received a Level S 30 Day Record Suspension with only a 12-month review period, Mr. Harris committed an attendance infraction and only received a Standard Formal Reprimand, which is less severe than an Alternative Handling and not even included on the PEPA Policy.  (Exhibit 2, pg. 003289 and Exhibit 25, pp. 003680 to 003681). Mr. Harris would have been subject to termination if he had received anything over a Formal Reprimand because the attendance infraction occurred during the 12-month review period of the Level S 30 Day Record Suspension he received on July 30, 2018. If Mr. Harris was Black, he would have been fired but yet again BNSF afforded much more favorable treatment to Jackson's White coworker.

On or about April 9, 2021, Mr. Harris received a Standard 10 Day Record Suspension for an attendance violation with a 12-month review period. (Exhibit pg. 003289 and Exhibit 25, pp. 003682 to 003683).

On or about November 8, 2021, Mr. Harris was disciplined for "shoving into a customer's facility resulting in the derailment of one rail car on October, 25, 2021." (Exhibit 2, pg. 003289 and Exhibit 25, pp. 003684 to 003686). Notably, Mr. Harris was not charged with a 1.6 violation and only given an Alternative Handling, even though this

violation occurred during a review period. *Id.* According to PEPA Policy B3a., Mr. Harris should have received at the minimum a Record Suspension of 10 days. (Exhibit 26, pg. 001150). Of course, that didn't happen, because once again BNSF chose to give him an Alternative Handling, which is below a 10-day Record Suspension. (Exhibit 2, pg. 003289 and Exhibit 25, pg. 003685).   So, in essence every time a similarly situated White employee gets in trouble they get more lenient treatment than Jackson for similar infractions.   Jackson got his job back in 2019 and had no discipline until 2021, the same year Jackson filed the present lawsuit.  No similarly situated Engineer/Conductor identified on Plaintiff Jackson Exhibit 2 were given a 36-month review period for any of their infractions. These White comparators either did not receive a review period or at the most received a 12-month review period. Clearly it is much easier to get in trouble when an employee receives three times as much time to do so. Many of the comparators would have been terminated if they had received a 36-month review period. Once again, Jackson received a 36-month review period for discipline he received on his first day working for the Red River division of BNSF.

    **4.**    **Unequal   Discipline   of   Jasper   Stanley   (White/Caucasian Engineer/Conductor)**

On or about November 9, 2020, Jasper Stanley received no discipline for "failure to properly ride and provide proper safeguards during a shove move…" on October 15, 2020. (Exhibit 2, pg. 003290 and Exhibit 22, pp. 003639 to 003645).   Mr. Stanley received a "Cancelation" for this infraction. *Id.* Jackson has never received a Cancelation in his entire career working for BNSF. (Exhibit 1, pg. 6, Para. 26).

On or about January 29, 2021, Mr. Stanley received discipline for running through a switch on September 4, 2020. (Exhibit 2, pg. 003291 and Exhibit 22, pp. 003636 to 0003637). Mr. Stanley was given an Alternative Handling for this infraction and wasn't charged with a GCOR 1.6 violation. *Id.*

On or about October 27, 2020, BNSF gave notice to Mr. Stanley that an investigation was scheduled because of his "failure to properly ride and provide proper safeguards during a shove move at SSS Duke…" on October 15, 2020.  (Exhibit 22, pg. 003639).  This investigation of this infraction got postponed twice **and ultimately canceled**. (Exhibit 22, pgs. 003641 to 003645). Mr. Stanley received no discipline for this infraction.  **Mr. Stanley received 2 Cancelations within a 12-month period but again Jackson has never received a Cancelation in his entire career working for BNSF.** (Exhibit 1, pg. 6, Para. 26). Ross Molyneaux and Kim Sauceda called for the investigation of this infraction, and they are both involved as supervisors on some of the disciplinary actions taken against Jackson in this matter. (Exhibit 22, pg. 003639 and Exhibit 2, pg. 003292).

On or about August 3, 2021, Mr. Stanley was disciplined *again* for running through another switch, but he is only given a Standard Formal Reprimand, which is below an Alternative Handling. (Exhibit 22, pg. 003647 and Exhibit 2, pg. 003291). Astonishingly, Mr. Stanley is given less severe punishment for his second time running through a switch in less than a year.   According to the PEPA Policy B3a., Mr. Stanley should have been given a Record Suspension of 10 days, but he instead is given even

lighter discipline for the second infraction compared to the first infraction of running through a switch. (Exhibit 26, pg. 001150). Not only did Mr. Stanley receive 2 cancelations and punishment inconsistent with BNSF's policies, he also was promoted to work as a Temporary Road Foreman. **Jackson has never ran a switch in his entire career with BNSF, and he has never been promoted**. (Exhibit 1, pg. 6, Para. 27).

### 5. Unequal Discipline of Nancy Shapley (White/Caucasian Engineer/Conductor)

Nancy Shapley committed three (3) violations within a three-month period from April 1, 2019 to December 26, 2019, for which she received 2 Cancelations and a very mild form of discipline called "Risk Reduction Education." (Exhibit 2, pp. 003289-03290 and Exhibit 24, pp. 003666 to 003671). Jackson again has never had any of his discipline canceled nor has he ever received Risk Reduction Education. (Exhibit 1, pg. 6, Para. 27 and 28). These are luxuries only afforded to his similarly situated White coworkers.

### CONCLUSION

Plaintiff's allegations set forth a claim for relief for race discrimination. Accordingly, Jackson has proffered sufficient evidence of pretext to show that BNSF afforded Jackson unequal treatment as to discipline and was terminated because of his race and as a result, BNSF is not entitled to a dismissal.

WHEREFORE, PREMISES CONSIDERED, and for all of these reasons, Jackson prays that Defendant's Motion for Summary Judgment be denied, and for such other and further relief to which he may be justly entitled.

Respectfully submitted,


_____/S/ *Ashok Bail*_____
ASHOK BAIL
ATTORNEY-IN-CHARGE
STATE BAR # 24043541

3120 Southwest Freeway, Suite 450
Houston, TX 77098
(832) 216-6693
(832) 263-0616 (Fax)
ashok@baillawfirm.com


## CERTIFICATE OF SERVICE

On July 17, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


By: /s/ Ashok Bail_____
        Ashok Bail

31