IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DEWAINE JACKSON JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00156 |
| | § | |
| BNSF RAILWAY, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant BNSF Railway Company ("BNSF" or "Defendant") submits this reply in support of its motion for summary judgment on all claims of Plaintiff Dewaine Jackson, Jr. ("Jackson" or "Plaintiff").

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. JACKSON HAS ABANDONED MANY OF HIS CLAIMS BY FAILING TO RESPOND TO BNSF'S ARGUMENTS. ............................................................... 1

III. OBJECTIONS TO JACKSON'S DECLARATION ............................................... 3

IV. JACKSON'S DISPARATE TREATMENT CLAIMS FAIL ................................. 4

    A. Jackson's Discriminatory Discharge Claim Fails. ..................................... 5

    B. Jackson's Claim Regarding Failure to Transfer Engineer Seniority Fails. ........ 10

    C. Jackson's Claims Based on the Remaining Alleged Adverse Actions Fail. ...... 10

        1. Jackson's flawed discussion of purported comparators. ................................ 11

        2. Jackson has not shown disparate discipline. ..................................................... 13

            a. Level S Record Suspension ............................................................................ 13

            b. Alternative Handling ..................................................................................... 15

            c. Coaching and Counseling ............................................................................. 15

CONCLUSION ............................................................................................................... 15

CERTIFICATE OF SERVICE ....................................................................................... 16

**I.     INTRODUCTION**[1]

In his response to BNSF's motion for summary judgment, Jackson points to no evidence to support his claim that BNSF gave preferential treatment to other employees under nearly identical circumstances. He instead seeks to rely on various conduct he claims was similar but that plainly is not under established law. Moreover, Jackson fails to even mention the undisputed evidence that the two key decisionmakers as to his discharge did not know his race, which alone defeats his claim for discriminatory discharge even apart from Jackson's failure to present evidence of pretext. On his other adverse-action claims, he failed to address the dispositive point that none of the events were actionable adverse employment actions and, in any event, he failed to show discrimination in taking those actions. Finally, Jackson has abandoned any hostile work environment claim he intended to assert by failing entirely to respond to any of BNSF's arguments on such a claim. Because Jackson failed to present any competent evidence that raises a genuine issue of material fact on any of his claims, the Court should grant summary judgment.

**II.    JACKSON HAS ABANDONED MANY OF HIS CLAIMS BY FAILING TO RESPOND TO BNSF'S ARGUMENTS.**

Jackson failed to respond to numerous arguments in BNSF's supporting brief, each of which was supported by adequate evidence. His failures to respond fall into two main categories. First, he does not address BNSF's arguments and evidence showing that none

---

[1] BNSF includes the following rebuttal evidence with this reply: (a) Supplemental Declaration of Stephanie Detlefsen (attached as Exhibit I) ("Detlefsen Supp. Decl."); (b) additional excerpts from Deposition of Dewaine Jackson (attached as Exhibit J) ("Jackson Dep."). BNSF also cites to BNSF's Motion for Summary Judgment (ECF 38) ("MSJ Brf.") and Jackson's Response to Defendant's MSJ (ECF 45) ("Resp.").

1

of the events he complains of other than his discharge were actionable adverse employment actions under settled law. *See* MSJ Brf. at 17-25. Those events are: (1) the delay in his engineer seniority transfer[2]; (2) the July 2017 Level S Record Suspension; (3) the 2021 Coaching and Counseling; and (4) the 2021 Alternative Handling.[3] Although the Court can choose to address only the adverse employment action issue as to these events, BNSF will briefly address them below in connection with his arguments about differential treatment of similarly situated individuals.

Second, BNSF explained in its supporting brief that it was unclear whether Jackson intended to assert a hostile work environment claim but that if he did, the claim failed on the merits. *See* MSJ Brf. at 25-30. Jackson again ignored this argument in his response. Although he mentions the topic in his factual discussion, he made no effort to address BNSF's arguments as to two independent grounds for summary judgment or to point to evidence that would undermine those grounds.

Because Jackson failed to address the arguments and evidence on those points, the Court should accept BNSF's evidence as undisputed and grant summary judgment on those issues.[4]

---

[2] Although Jackson does not directly address BNSF's no-adverse-action argument, he does include statements alleging a monetary loss associated with the delayed seniority transfer. Resp. 10. BNSF addresses that contention below.

[3] As previously stated in BNSF's brief, Jackson did not raise the July 2017 Level S Record Suspension or the 2021 Alternative Handling adverse actions on which he was suing in his complaint. Thus, the Court could also find that he has not pleaded claims related to those asserted adverse employment actions.

[4] *See* S.D. Tex. LR 7.4 ("Failure to respond to a motion will be taken as a representation of no opposition."); *Ellis v. Carrington Mortgage Servs., LLC*, No. 4:19-CV-4370, 2021 WL

## III. OBJECTIONS TO JACKSON'S DECLARATION

Jackson includes a lengthy declaration that is objectionable on many grounds, most prominently that it is full of statements that are conclusory and as to which Jackson lacks personal knowledge as required. *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602.[5] Although the Court need not address the numerous problems with the declaration to grant BNSF's motion, BNSF objects to the following, *see* Fed. R. Civ. P. 56(c)(2):

- "I was given a more harsher [sic] discipline for a first time offense than any of the five similarly situated white coworkers identified in Plaintiff Jackson Exhibit 2…" Jackson Decl. ¶ 6. **Objection: no personal knowledge, conclusory.**

- "…SJ Smith (White) and J Meyers (White) received their transfers in less than 30 to 45 days after they put their paperwork in…Also, when SJ Smith received his transfer, he was on a Level S Suspension. As such, pursuant to BNSF policy, he should not have received a transfer while serving that suspension." Jackson Decl. ¶ 16. **Objection: no**

---

3603604, at *3-9 (S.D. Tex. Aug. 13, 2021) (granting summary judgment for the defendants when the plaintiff failed to respond to the defendants' arguments); *Garcia v. City of McAllen, Tex.*, No. 7-19-CV-00068, 2020 WL 1660095, at *5 (S.D. Tex. Apr. 1, 2020) (granting the defendants' motion claims because the plaintiffs made no attempt to address or defend those claims and citing S.D. Tex. LR 7.4); *see also Bedford v. Tex. Dep't of Transp.*, 810 F. App'x 264, 268 (5th Cir. 2020) (finding no error where the district court concluded that the plaintiff had abandoned claims when he failed to respond to the defendant's motion for summary judgment on those claims); *Matter of Dallas Roadster, Ltd.*, 846 F.3d 112, 125-126 (5th Cir. 2017) (plaintiff abandoned his claim where his summary judgment response did not contain any argument about it); *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988) (when a non-movant fails to respond to summary judgment argument, the court may accept the movant's evidence as undisputed and enter judgment in movant's favor if the summary judgment evidence establishes a prima facie showing of the movant's entitlement thereto).

[5] *See Smith v. Robin Am., Inc.*, 484 F. App'x 908, 911 (5th Cir. 2012) ("Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence."); *Heller v. Shahroodi*, No. CV H-17-2544, 2019 WL 1556315, at *3 (S.D. Tex. Feb. 20, 2019) ("Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge.").

**personal knowledge.**

- "…JR Burnett (White) at the time was making close to $3,000 more a month doing extra work." Jackson Decl. ¶ 17. **Objection: no personal knowledge.**

- "…However, TS Praitt (White) and TW Ferguson (White) have done exactly the same thing that I received a Coach and Counseling for, on multiple occasions, but they did not receive any discipline. To my knowledge, I am the first person employed by BNSF in Galveston or Houston to receive a Coach and Counseling for the type of actions I took on April 21, 2021." Jackson Decl. ¶ 18. **Objection: no personal knowledge, conclusory.**

- "…In my June 15, 2021 derail, under nearly identical circumstances as Mr. Godfrey's derail on September 14, 2021, I was told that I must share his discipline with the person who was in control of the movement." Jackson Decl. ¶ 19. **Objection: no personal knowledge, hearsay, conclusory.**

- "…Mr. Godfrey in the same capacity as an Engineer ran over the same derail I did, in the same Casey yard. The only difference between Mr. Godfrey and me was that Mr. Godfrey had control of the movement. Which means he was on the head locomotive, could see the direction he was moving, and could stop and avoid any obstacles in his path. Mr. Godfrey also received an Alternative Handling, but his Conductor received no discipline. So, Godfrey had control of the movement and didn't have to share discipline with his Conductor." Jackson Decl. ¶ 20. **Objection: no personal knowledge, conclusory.**

- "Many Black employees have gone to HR over racial problems but nothing came from it." Jackson Decl. ¶ 23. **Objection: no personal knowledge, conclusory.**

- "On or about May 20, 2022, I was informed by the union's Local Chainman Mr. Dwayne Martin that Mr. Godfrey was recently promoted to the position of Safety Coordinator over the Houston Region. Jackson Decl. ¶ 24. **Objection: hearsay.**

## IV.   JACKSON'S DISPARATE TREATMENT CLAIMS FAIL

Jackson's effort to prove his intentional discrimination claims rests on his ability to

4

show disparate treatment. He points to what he labels differential treatment of similarly situated individuals in support of both his prima facie case and his pretext argument. But as BNSF argued in its brief, as a matter of undisputed fact Jackson has not pointed to a single comparator who was "similarly situated" and received more favorable treatment. MSJ Brf. at 16-18. His effort to do so is fraught with impermissible assumptions and numerous inaccurate statements about BNSF's discipline policy reflecting that he simply does not understand the policy. Most problematic, he frequently points to discipline (or lack thereof) for others that has no plausible relationship to the events for which he was disciplined but instead reflects an effort to opine on how he thinks others should have been disciplined without regard for the lack of similarity in the alleged conduct. And even in the few instances when he points to conduct that appears similar, he fails to address obvious differences that prevent the circumstances from being nearly identical. Jackson's approach does not come close to showing a fact issue on either his prima facie case or pretext.

### A. Jackson's Discriminatory Discharge Claim Fails.

Jackson's effort to avoid summary judgment as to his discharge claim easily fails. Although there are numerous deficiencies in his position, one glaring problem is Jackson's failure to address the undisputed evidence that the decisionmakers as to his discharge—Janssen Thompson and Stephanie Detlefsen—*did not know his race*. Although Jackson apparently hopes the Court will gloss over that problem, the point is dispositive. Detlefsen acted for the PEPA team and recommended Jackson's dismissal. MSJ Brf. at 8. And Thompson then made the decision after independently reviewing the evidence, but consistent with his practice of following the PEPA recommendation. *Id.* Without knowing

5

his race, they could not have discriminated against Jackson based on his race. The Court need go no further than that fact to dispose of his discriminatory discharge claim.

As to the points Jackson does address, his efforts fall short. At the outset, Jackson's approach is inconsistent. He first says the issue is not whether he engaged in the conduct but only whether the discipline was discriminatory. Resp. at 2. But then he appears to argue that he did not engage in dishonesty. Resp. at 4-5. Regardless, there is no dispute that Jackson submitted falsified documents and that both Thompson and Detlefsen believed he engaged in dishonesty. MSJ Brf. at 8. Indeed, even the arbitration award he seeks to rely on, discussed further below, said he was guilty of the violation. *Id.* at 9.

Jackson does assert that his direct supervisor, Aaron Petersen, told him that the FMLA issue "was a huge miscommunication" and that Petersen's boss (Thompson) told Petersen to "stay out of it." Jackson Decl. ¶ 13. To the extent he implies Petersen did not view the conduct as dishonest, his point is both incorrect and immaterial. First, the Court can disregard the "miscommunication" contention because it is inconsistent with Jackson's deposition testimony about that conversation. *See* Jackson Dep. 17:20-24 (Ex. J); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (party cannot defeat summary judgment using "an affidavit that impeaches, without explanation, sworn testimony"). Second, the alleged statement apparently preceded Petersen's review of the investigation record. *See* Petersen Decl. ¶ 11. Third, it is immaterial because (1) the evidence is undisputed that the PEPA team recommended discharge, Thompson viewed the conduct as dishonesty, and Thompson's practice is to follow the PEPA recommendation, and (2) neither the PEPA team member nor Thompson knew of Jackson's race.

6

Jackson's main argument is to point to Jason Elliott as the primary alleged comparator. Resp. at 16. BNSF anticipated that reliance and addressed in detail why Elliott is not an appropriate comparator. *See* MSJ Brf. at 18-20. Jackson simply refuses to address the points BNSF already made that show why Elliott is not similarly situated.

First, as to the April 2017 mileage issue, BNSF explained that Elliott was charged with dishonesty because he submitted mileage reimbursement paperwork using an older method BNSF previously accepted but that had since changed. Management decided to offer him a waiver of his right to an investigation hearing in exchange for accepting a formal reprimand with a one year review period. MSJ Brf. at 19. By contrast, Jackson did not submit paperwork in a way that BNSF once permitted but instead altered a document and submitted it as though the alterations were made by his physician. *Id*. at 6, 9, 19. Moreover, Thompson was not involved in Elliott's case but was the decisionmaker as to Jackson's discharge. *Id*. at 8, 19.[6]

Second, as to Elliott's July 2019 incident, BNSF did conduct an investigation for dishonesty similar to Jackson, but Elliott, unlike Jackson, produced evidence that vindicated himself despite the suspicious paperwork that led to the investigation. *Id*. at 19. As a result, the PEPA team *declined* to support discipline of Elliott. MSJ Brf. at 20. Jackson cannot compare a situation where the decisionmakers *did not* find sufficient evidence of dishonesty with one where they did. What matters is how the decisionmakers perceived the

---

[6] Elliott also said that a different manager, Bob Boemio, intervened on Elliott's behalf, Resp. at 20. There also is no evidence that Boemio was involved in Jackson's discharge.

conduct.[7] Moreover, the PEPA team members in the two situations were different and, again, the PEPA team member with respect to Jackson did not know his race.

Jackson expends some effort trying to show that Thompson was involved in Elliott's second situation and intervened on his behalf, relying on a surreptitious recording that Jackson made of Elliott where Elliott said that Thompson was involved. Resp. at 17-19. But Elliott explained during his deposition that his statement about Thompson was his own speculation and that he did not actually know that Thompson was involved. Elliott Dep. 12:8-10; 27:6-16. Thus, the evidence is not that Thompson *was* involved but that Elliott *thought* Thompson was involved. And it doesn't matter if Thompson was involved because Thompson's practice is to follow the PEPA recommendation and—yet again—Thompson did not know Jackson's race at the time. So even if he had intervened on behalf of Elliott but failed to do so for Jackson, the failure could not have been based on Jackson's race.[8]

Jackson also briefly argues that another employee, Godfrey, engaged in dishonesty when he put his train into emergency but did not notify the dispatcher he had done so. Resp. at 21-22. Setting aside the fact that "failure to notify" is plainly not nearly identical to submitting a fraudulent leave document, Jackson's efforts fail. First, as the chart Jackson relies on shows, there was a different supervisor involved in that situation, Resp. at Ex. 2

---

[7] *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 n.27 (5th Cir. 2009) (whether the employee and his alleged comparator employees were similarly situated is judged from the perspective of the employer); *Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 210 (5th Cir. 2004) (same).

[8] Jackson also claims Kim Sauceda handled Elliott's discipline, Resp. at 23, but he fails to point to any evidence that Sauceda was involved in the decision not to discipline Elliott after the investigation or that she was a decisionmaker as to Jackson's discharge.

8

(3287), which is enough to distinguish the situation.[9] Second, BNSF does not treat such a failure to notify as a dishonesty issue but instead focuses on non-compliance with the rule requiring notification. Detlefsen Supp. Decl. ¶ 18. Again, the key to a disparate discipline argument is showing that the *decisionmakers* viewed the conduct similarly but chose to treat it differently without a legitimate explanation. Jackson opining that *he* thinks the conduct is similar does not suffice.

Jackson also attempts to rely on the arbitration decision reinstating him to show pretext. BNSF anticipated that argument and Jackson failed to respond: an adverse labor arbitration decision does not create a triable fact issue in a discrimination case. MSJ Brf. at 20-21.[10] Moreover, the arbitrator agreed that Jackson was guilty and did not rely on any claimed differential treatment of another employee. The arbitration decision simply has nothing to do with what Jackson must prove in this lawsuit.

---

[9] *West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020) (quoting *Lee*, 574 F.3d at 259–60) ("Employees with different supervisors…generally will not be deemed similarly situated."); *see also Landreneau v. Baker Hughes A G E Co.*, 801 F. App'x 919, 921 (5th Cir. 2020) (same); *Ramirez v. City of Odessa*, No. 94-50047, 38 F.3d 570, 1994 WL 574742, at *4 (5th Cir. Oct. 14, 1994) (per curiam) (holding that employees were not similarly situated because, among other things, "they were disciplined by a different decisionmaker…") (precedential).

[10] *See also Baker v. Exxon Chem. Am.*, 68 F.3d 467, 1995 WL 581611, *3 (5th Cir. 1995) (holding—in an unpublished but precedential decision under 5th Cir. L. R. 47.5.3—that arbitration award reinstating employee did not show that employer's decision was discriminatory); *see also Neylon v. BNSF Ry. Co.*, 968 F.3d 724, 729 (8th Cir. 2020) ("By itself, the board's finding that BNSF engaged in unreasonable and arbitrary discipline does not show retaliation."); *Mercier v. U.S. Dep't of Labor*, 850 F.3d 382, 390 (8th Cir. 2017) ("The fact that Mercier was eventually cleared by the CBA arbitration process and has returned to work…has no bearing on whether the…termination was in retaliation for reporting safety violations.").

### B. Jackson's Claim Regarding Failure to Transfer Engineer Seniority Fails.

Jackson says little about his complaint that Thompson delayed approval of the transfer of Jackson's engineer seniority. That transfer would simply allow Jackson to work not only as a conductor but also as an engineer. As noted, Jackson did not respond to BNSF's argument that the delay in that transfer was an adverse employment action. He does assert in his declaration that others who worked as engineers were called for jobs earning more money, Jackson Decl. ¶ 17, but he fails to explain any basis on which he would have personal knowledge of the earnings of others or to provide any evidence that at his seniority level he would have been called to work any of those allegedly higher paying jobs. Thus, he still has not shown an adverse employment action.

But the claim easily fails even if the Court assumes an adverse employment action. First, the delay could not have been discriminatory because, as previously mentioned, the person who delayed it, Thompson, did not know Jackson's race. Second, BNSF anticipated and previously explained why the two proposed comparators he points to were not similarly situated. MSJ Brf. at 21-22. Jackson fails to respond.[11]

### C. Jackson's Claims Based on the Remaining Alleged Adverse Actions Fail.

The remaining alleged adverse employment actions are: (1) the July 2017 Level S Record Suspension; (2) the 2021 Alternative Handling; and (3) the 2021 Coaching and Counseling. *See* MSJ Brf. at 22-25. As previously discussed, the Court can dispose of

---

[11] Jackson does assert that another employee, Godfrey, received a promotion and attempts to draw a comparison by saying Thompson had to approve the promotion. Jackson Decl. ¶ 24. His assertion is hearsay, stating what Jackson says a union representative told him, *id.*, and speculative in asserting Thompson would have been involved in that alleged decision.

Jackson's claims based on these events because Jackson failed to address BNSF's argument and evidence showing that none of these events are actionable adverse employment actions. And, abandonment aside, BNSF's arguments are legally correct: none of those events is actionable. *Id.* at 17, 22-24. Thus, the Court can properly grant BNSF's motion without further discussing those events. For the Court's benefit, however, and should the Court choose to go further, BNSF includes the following discussion of Jackson's deeply flawed efforts to show discrimination as to those events.

### 1. Jackson's flawed discussion of purported comparators.

Jackson's response includes a long-winded monologue about how he believes various other BNSF employees were disciplined in ways that differed from his discipline or were inconsistent with BNSF's policy, suggesting that BNSF failed to apply its policy to other employees. In most cases, his points are immaterial because he points to violations that are in no way similar to his own violations that led to the alleged adverse actions he complains of (e.g., discussing missed call, attendance, and different operating violations than those he engaged in). Beyond that, his discussion is full of misstatements and mistaken assumptions about BNSF's disciplinary process. And to be clear, these are not matters where there is a genuine issue of fact: he simply makes numerous statements and assumptions that are inconsistent with BNSF's actual policy. Although the Court can read the policy for itself, BNSF attaches a supplemental declaration addressing the problems.

As Detlefsen explains there, Jackson mistakenly and repeatedly treats all violations as though they are cumulative for purposes of the progressive disciplinary process and fails to recognize that the disciplinary progression applies separately within each category of

11

rules violation. Detlefsen Supp. Decl. ¶¶ 5-10. For example, an employee who is disciplined for a first attendance violation receives the first level of discipline (until last year a formal reprimand). *Id.* ¶ 8. If that employee is then disciplined for a standard violation, the employee receives the first level of progressive discipline for standard violations (also a formal reprimand)—not the second level— because the employee is at the first level of discipline for standard violations. *Id.*

In addition, Jackson misunderstands the concept of Alternative Handling. He repeatedly says that alleged comparators "received an Alternative Handling with no review period" and claims that Alternative Handling is "higher" or "lower" in the disciplinary progression than other discipline. Resp. at 21-22, 24, 26. But Alternative Handling is not discipline at all; it is a contractual matter between BNSF and certain unions for treating conduct in some situations outside of the disciplinary process. Detlefsen Supp. Decl. ¶¶ 11, 13. It is not a level within the progressive discipline system and is not subject to a review period as are certain discipline levels. *Id.*

Those problems explain Jackson's various complaints about others allegedly not being disciplined according to BNSF policy. Although there are too many to go through one-by-one—and there is no need to because they are immaterial—BNSF provides examples for the Court's benefit. One is that when Jackson points to Godfrey's violations on April 5 and April 23, Resp. at 21-22, and says Godfrey should have received a 10-day record suspension for the second one he is incorrect because Godfrey took Alternative Handling for those violations. Resp. Ex. 2 (3287-88). That is one of many times when Jackson incorrectly treats Alternative Handling as a step of progressive discipline.

12

Likewise, when Jackson says Godfrey received lower discipline in the form of a standard formal reprimand for a missed call in September 2020, Resp. at 22-23, he is mistaken because Alternative Handling is not discipline and a formal reprimand is the first step of discipline for a standard violation.[12] Jackson's discussion of Godfrey's November 2020 attendance violation and assertion that Godfrey should have received the second level of discipline, Resp. at 23-24, is one of the many times Jackson inappropriately treats different paths of progressive discipline cumulatively. Another example of that error comes when Jackson claims that another employee, Harris, should have been discharged because an attendance violation occurred during the 12-month review period of a Level S 30 Day Record Suspension. Resp. at 27. Attendance and Level S (Serious) are on separate paths, so the progressive steps run separately, not cumulatively. Detlefsen Supp. Decl. ¶¶ 5-10.

Jackson cannot create a genuine issue by simply putting into a declaration a misapplication of a written policy the Court can review for itself and the workings of which Jackson has no particular personal knowledge. Nor would such an approach create a *material* issue in any event because the various rules violations he discusses are not nearly identical to his violations, either in nature of the conduct or the supervisor involved.

    **2.**    **Jackson has not shown disparate discipline.**

        **a.**    **Level S Record Suspension**

Jackson received a Level S Discipline when his train passed a stop signal in violation

---

[12] Jackson also incorrectly states that a missed call is an attendance violation when they are separate types of violations. Detlefsen Supp. Decl. ¶ 18. He also inexplicably says that a formal reprimand is not included in PEPA when it is. *Id.* & Ex. 1 (PEPA IV.B.2.).

13

of BNSF rules. MSJ Brf. at 4. He claims his 2017 Level S Discipline was discriminatory because "he was given extremely harsher discipline for a first time offense than any of the five similarly situated White coworkers identified…" Resp. at 3. He also claims that "[n]one of the 5 comparator employees, identified in the chart provided to Jackson in discovery of this matter, received any Serious Violations (Level S) or anything over a 12-month review period." Resp. at 22.

Jackson's argument is baffling. His repeated assertions that he had a clean record and "was given extremely harsher discipline for a *first time offense*" as of 2017 are demonstrably false. Jackson was disciplined in 2014 and 2016, both of which were within the three-year window under PEPA applicable to reducing the normal 36-month review period. Jackson Dep. at Ex. 4; Detlefsen Supp. Decl. ¶ 19 & Exs. 2, 3 and 4. As such, Jackson's 36-month review period was correct because he was not discipline free as of July 2017. *See* Detlefsen Supp. Decl. Ex. 1 (PEPA IV.C.2.).

Beyond that, he has not pointed to any similarly situated employee as to his violation for running through a stop signal. He identifies three other violations for going past a stop signal (Harris (6/13/17 and 7/30/18) and Shapley (11/10/21)). *See* Resp. Ex. 2 (3288-90). Each involved a different supervisor than the supervisor involved in Jackson's stop-signal violation (Petersen).[13] And, except for Harris receiving Alternative Handling for the

---

[13] Jackson appears to try to avoid the different supervisor/decisionmaker problem by pointing to Thompson as the General Manager. But he overlooks that Thompson said he gets involved in discipline when dismissal is a potential outcome, Thompson Decl. ¶ 5, and that Jackson himself testified to the same thing. Jackson Dep. at 193-94.

14

6/13/17 incident (again, from another supervisor) the other two also received Level S Record Suspensions, with the only difference being the review period, which is a function of their records at the time of the discipline. *See id.* Thus, he has not shown differential discipline of any similarly situated employee with respect to his July 2017 discipline.

### b.  Alternative Handling

Jackson also claims his 2021 Alternative Handling was discriminatory. He claims Godfrey is a comparator because he also ran over a derail in 2021. Resp. at Ex. 2. But both Jackson and Godfrey accepted Alternative Handling. Further, although Jackson argues that Godfrey's *conductor* did not receive discipline, he does not identify the conductor or provide any evidence supporting his claim.

### c.  Coaching and Counseling

As to the 2021 Coaching and Counseling, Jackson simply points to the same two alleged comparators (TS Praitt and TW Ferguson) BNSF already addressed. Resp. at 10-11; MSJ Brf. at 22-23. Jackson fails to respond to BNSF's arguments on them, and he offers no admissible evidence to support his assertions about them.

## CONCLUSION

Jackson has not shown a triable issue of discrimination as to his discharge or any of the other events he has complained of. In many cases he simply failed to address BNSF's arguments and in others his efforts are demonstrably mistaken. For the reasons stated here and in BNSF's opening brief, BNSF asks the Court to dismiss Jackson's claims with prejudice, order that Jackson take nothing from BNSF, and award BNSF its costs.

Dated: June 29, 2022.

        Respectfully submitted,

        /s/ Bryan P. Neal
        Bryan P. Neal, attorney-in-charge
         State Bar No. 00788106
         Southern District No. 19107

        HOLLAND & KNIGHT LLP
        One Arts Plaza
        1722 Routh Street, Suite 1500
        Dallas, Texas 75201
        Telephone: (214) 969-1700
        Facsimile: (214) 969-1751
        E-mail: bryan.neal@hklaw.com

        OF COUNSEL:

        Andrea James
         State Bar No. 24092571
         Southern District No. 3124869

        HOLLAND & KNIGHT LLP
        811 Main Street, Suite 2500
        Houston, Texas 77002
        Telephone: (713) 821-7000
        Facsimile: (713) 821-7001

        E-mail: andrea.james@hklaw.com
        ATTORNEYS FOR DEFENDANT
        BNSF RAILWAY COMPANY

## CERTIFICATE OF SERVICE

    I certify that on June 29, 2022, a copy of this document was electronically filed. Notice of this filing will be sent to all counsel of record by operation of the Court's Electronic Filing System.

        s/ Bryan P. Neal
         Bryan P. Neal